**UNITED STATES of America, Plaintiff,**

v.

**Ngia Xiong VUE and Vang
Ver Vue, Defendants.**

No. 4:CR93–3073.

United States District Court,
D. Nebraska.

Oct. 27, 1994.

Paul D. Boeshart and Sara E. Fullerton, Asst. U.S. Attys., Lincoln, NE, for plaintiff.

Alan G. Stoler, Omaha, NE, for defendant Vang Ver Vue.

D. Kirk Wolgamott, Lincoln, NE, for defendant Ngia Xiong Vue.

## MEMORANDUM AND ORDER

KOPF, District Judge.

The unusual question in this case, before the court on the defendants' motions for downward departure (Filings 77 and 80), is whether section 5K2.0, p.s., of the United States Sentencing Commission Guidelines

Manual (U.S.S.G.) permits a departure in a drug case involving a significant amount of opium where: (1) both perpetrators are war refugees who fled their homeland to avoid the threat of persecution and death in retaliation for supporting the democratic interests of this country, and (2) both perpetrators are illiterate and lack any education, are unable to speak English, and have virtually no employment experience—aside from fighting, their only employment experience was farming in the remote hills of their country.

The defendants are Hmong tribesman from Laos.[1] Both are over 40 years of age and illiterate. Neither speaks English. Both men were farmers who fought for American interests in Laos during the Vietnam war. Both were wounded in combat, and both lost close family members during the war. Together with their families, both defendants fled Laos for Thailand because of fear of persecution and death. After they spent time in the camps in Thailand, the United States allowed both men and their families to immigrate to this country because they were refugees. Both defendants have failed to find work in the United States. One is addicted to opium, receives supplemental social security benefits, and tried to commit suicide while going through drug withdrawal in jail. The other has an injured hand and receives government-subsidized housing. Both men have spouses and dependent children. Neither has any criminal history. Both were informed about the laws of the United States when they entered this country; both were provided with a federal allot-ment of money; and both were informed about available social services. Both men pled guilty to the charges in this case, and after adjustments for acceptance of responsibility, the guideline range for each man is 46–57 months (offense level 23, criminal history category I).

Given the totality of the unusual circumstances of this case, both in kind and degree, I find and conclude that this case falls outside the "heartland." *United States v. One Star,* 9 F.3d 60, 61 (8th Cir.1993) (citing *United States v. Big Crow,* 898 F.2d 1326, 1331–32 (8th Cir.1990)) (affirming downward departure of twelve levels based in part upon unusual mitigating circumstances of life on an Indian reservation). *Compare United States v. Restrepo,* 999 F.2d 640, 644 (2nd Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 405, 126 L.Ed.2d 352 (holding that defendant's status as an alien may serve as a basis for downward departure if the fact of alienage is sufficient to take the case out of the "heartland," but concluding that the facts in *Restrepo* did not warrant such a departure). *See also United States v. Haversat,* 22 F.3d 790, 794 (8th Cir.1994); *United States v. Goff,* 20 F.3d 918, 921 (8th Cir.1994).

Accordingly, for the reasons articulated below, I shall grant the motions for departure with regard to both men and depart downward from the Guidelines pursuant to U.S.S.G. § 5K2.0, p.s.[2] I suggest to the parties that the proper departure is a reduction of four levels (to level 19, criminal history category I, resulting in a range of 30–37

---

1. The facts described in the text are fully consistent with information regarding Hmong refugees provided to me by the United States Pretrial Services Office for the District of Nebraska. For example, the background information describes the dislocation of the Hmong this way:

   > Located near the border of Northern Vietnam, the Hmong have never had a peaceful life. When the Royal Lao government collapsed, the Hmong, because of their involvement in American military operations, were forced to flee the country.
   > A few of the Hmong families were airlifted to safety in refugee camps in Thailand, but thousands were abandoned, forgotten and left behind to run for their lives through the jungles. Those who remained had been sent to reeducation camps, gassed, or killed.

   Hongsa Chanthavong, *The Hmong* Pt. II, History (1990) (Attach. to Letter of 10/18/94 from Donald A. Ranheim, Chief U.S. Pretrial Servs. Officer, D.Neb., to Kopf, J., transmitting background information on Asian refugees received from U.S. Pretrial Servs. Office, D.Minn.).

   Although I reviewed this information, the factual findings set forth in the text were developed from the evidentiary sources listed in the text and not from this background information. Moreover, recognizing as I do that I may not rely for any purpose upon race, national origin, or ethnic background, I *do not* reach the decision to depart based upon any supposed characteristic of the Hmong generally.

2. I do not agree with the defendants that departure is appropriate for all the reasons suggested in their motions or briefs.

months in prison).[3] However, I shall leave the extent of departure for determination at sentencing so that all parties may advise me at that time if they disagree with the proposed extent of the departure.

## I. FACTS

I turn now to the facts of this case. Aside from two credibility issues which I shall resolve later, the material facts are undisputed. I derive these facts from the transcript of the evidentiary hearing and related exhibits (Filings 93 and 97),[4] the unchallenged portions of the presentence reports (PSR's), and the Rule 11 hearing transcripts (Filings 59 and 60).

### A. THE OFFENSE

The facts of the offense are these:

Ngia Xiong Vue (N. Vue) and Vang Ver Vue (V. Vue) are unrelated males who were passengers in the back seat of a car stopped by a state patrol trooper for speeding on Interstate 80 just west of Lincoln, Nebraska. The car was a rental vehicle, and a passenger in the front seat was listed as the person who had rented it in St. Paul, Minnesota, three days earlier. In just three days the car had logged about 3,500 miles. The trooper became suspicious after the passenger who rented the car stated that the four men had driven to Denver from St. Paul. The trooper doubted this story because he knew such a trip would have been much less than 3,500 miles. He asked for permission to search the car and obtained consent.

During the search, a piece of cellophane with a black tar substance and a large bamboo "bong-type" pipe were discovered in the back seat where N. Vue and V. Vue were seated. The trunk of the car contained two bags, one of them a blue duffel bag. Inside the blue duffel bag were three "brick-like" packages later determined to contain 2,490.9 grams of opium. In the second bag, a flowered garment bag, were seven "bricks" of opium weighing 6,492.6 grams.

The blue duffel bag was linked to N. Vue because it contained a pill bottle with a prescription label and a doctor's name on it. N. Vue was found to be in possession of the doctor's card and a letter from the doctor.

The flowered garment bag was linked to V. Vue because it contained clothing with a 36–inch waist. Only V. Vue had a 36–inch waist; the waists of the other men were all 30 inches or less.

Both N. Vue and V. Vue pled guilty to conspiracy to distribute and possess with intent to distribute opium in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2. Charges against the other occupants of the car were dropped, apparently because N. Vue informed the government that the other men knew nothing of the opium found in the trunk.

### B. N. VUE

I turn next to the facts as they pertain to N. Vue.

The government's immigration records (Ex. 1) establish that N. Vue was born in Laos in 1939. He was displaced from Laos as a refugee in 1984 and fled to Thailand because he feared for his life as a result of service to the interests of this country. He lived in a camp in Thailand. He has no education. He executed the immigration papers with his mark, a fingerprint. He represented that he had been in the military and gave a detailed account of his military service

---

**3.** Because I find that the facts, particularly the quantity of drugs found in his garment bag, do not sustain defendant Vang Ver Vue's position that he is entitled to a mitigating-role adjustment, I deny his objection (asserted in Filing 77) to the presentence report. Thus, I accept the presentence report over the objection of Vang Ver Vue, but depart downward for the reasons stated in the text.

**4.** At the evidentiary hearing, the government agreed with the defendants that if called to testify the defendants would testify in accordance with a stipulation read into the record by each defendant's counsel. Because the defendants do not speak English, this stipulation significantly expedited the hearing, although an interpreter was, of course, present. The government did not stipulate that the testimony was accurate, only that had these men testified, their testimony would have been consistent with the stipulation. Except as noted in the text, the government did not adduce any evidence that substantially contradicted the stipulated testimony of the two men.

to the Immigration and Naturalization Service (INS) that was consistent with much of his stipulated testimony presented at the hearing on the defendants' motions for downward departure. (*Compare* Filing 97, at 9–12 (stipulated testimony of N. Vue) *with* Ex. 1, INS camp interview form of 12/3/85 & 11/23/85.) N. Vue testified, and immigration documents support his claim, that he was a farmer and village chief who fought against the "PL" (presumably Pathet Lao). He claimed to have served with two Americans: "Pop" with the "USAID" and "Jerry" with the "CIA." He was wounded in battle, suffering an injury to his knee that left him hospitalized for a month. The defendant stated that he lost his mother in Laos due to malnutrition and malaria and his father due to a grenade explosion, and this seems to be confirmed by immigration documents. (*Compare* PSR ¶ 59 *with* Ex. 1, INS camp interview form of 12/3/85 & 11/23/85.)

An American immigration officer found that N. Vue had a "well founded fear" for departing Laos as a "Hmong" because he was a member of a "hilltribe," because he was a member of the "Military or Employee" and because of "Ethnicity." (Ex. 1, INS camp interview form of 12/3/85.)

N. Vue's PSR establishes that he immigrated to the United States with his wife and five children in 1986. Three of his children are now over 21 years of age, while two are age 18 or younger. The probation officer verified with the government that the defendant came to the United States "with refugee status as a Legal Permanent Resident." (PSR ¶ 59.)

N. Vue admitted in his PSR that he was addicted to opium and had smoked opium in the car he was traveling in when arrested. He claimed his addiction to opium resulted from an inability to obtain medication to treat his war wounds. Although asked on his immigration application whether he suffered from drug addiction, he denied any such addiction. N. Vue told the probation officer he was helping to transport the opium for a "Mr. A" (real name unknown) in exchange

for a small amount of opium for his personal use.[5]

His PSR establishes that N. Vue experienced severe withdrawal pains while in jail and that he attempted suicide while in jail. He takes high blood pressure medicine apparently to counteract swelling in his legs that his lawyer stated is a result of withdrawal from opium.

N. Vue receives supplemental security income of $434.00 per month, and his wife receives public assistance as well. He has never been employed while in the United States and has resided in the Twin Cities area of Minnesota since entering the country. When he came to this country, N. Vue was informed of the laws of the United States, given a federal allotment of money, and informed of available social service benefits.

## C.  V. VUE

I next review the facts as they relate to V. Vue.

The government's immigration records (Ex. 2) establish that V. Vue was born in Laos in 1950. He was displaced from Laos as a refugee in 1977 and fled to Thailand, where he lived in a camp. He has no education. He executed his immigration papers with his mark, an "X" and a fingerprint. His ethnic background is Hmong.

Although V. Vue indicated in his response to one of the questions on his immigration papers that he had no military service, (Ex. 2, Form I–590, Question 14), on another immigration document the *government* described V. Vue's occupation as "military and farmer." (Ex. 2, Refugee Data Ctr. Doc.) In his stipulated testimony, V. Vue gave a detailed account of his military service in which he claimed, among other things, that he fought for a significant period time on behalf of the CIA and the Laotian Army against the North Vietnamese Army and then went "undercover."

---

**5.** The government does not contend, and the probation officer does not suggest, that either

defendant's reference to "Mr. A" indicates a lack of candor.

Immigration records [6] confirm that between 1971 and 1979 V. Vue had no children "because they were living in forest & under nourished." (Ex. 2, Family Trees Form III Thailand at p. 3 of 4 (n. at bottom of Tree # 2).) It appears that V. Vue's second wife died while "in the forest." (PSR ¶ 41.) In addition, V. Vue produced a picture of himself in a military uniform (Ex. 102), a well-worn military cap (Ex. 104) matching the cap in the photograph, and shoulder epaulets (Ex. 103) matching the epaulets shown in the photo.

V. Vue claimed to have been seriously wounded a number of times. Immigration papers confirm that he has noticeable scars. (Ex. 2, Form I–590, Question 4; Ex. 2, Medical Examination of Visa Applicants.) V. Vue also told the probation officer that he has numerous bullet wounds, one of which has caused a weakness in his right hand.

The PSR found that as "verified with the Immigration & Naturalization Service, the defendant was brought to the United States as a refugee on July 27, 1987." (PSR ¶ 41.) He has not been employed since entering the United States. He resides with his wife and eleven children in government-subsidized housing and has lived in the Twin Cities area of Minnesota since entering the country. He does not claim to suffer any addiction to drugs or alcohol. When he came to this country, V. Vue was informed of the laws of the United States, given a federal allotment of money, and informed of available social service benefits.

V. Vue told the probation officer that he accompanied N. Vue to "Mr. A's" house, that he knew N. Vue was addicted to opium, that he knew N. Vue wanted to obtain opium to smoke, and that he knew the vehicle they were traveling in contained opium. He did not explain how a substantial quantity of opium ended up in his garment bag.

## II. LAW

Before I apply the law to the facts of this case, four preliminary observations are in order.

First, because the defendants will be sentenced after November 1, 1994, I shall apply Amendment 6 to U.S.S.G. § 5K2.0. *See* Amendments to Sentencing Guidelines for United States Courts, 59 Fed.Reg. 23608, 23609–10 (May 5, 1994) (effective Nov. 1, 1994). Among other things, this amendment provides that offender characteristics or other circumstances that are not ordinarily relevant in determining whether the sentence should be outside the applicable guideline range may be relevant "if such characteristic or circumstance is present to an unusual degree and distinguishes the case from the 'heartland' cases covered by the guidelines in a way that is important to the statutory purposes of sentencing." *Id.* at 23609. The commentary to this amendment cautions that such cases "will be extremely rare." *Id.* at 23610.

While it does not concede that the facts justify application of the amendment, the government does not dispute that it is appropriate to apply the amendment in this case if warranted by the facts. In any event, my ruling would be the same whether or not I applied the express language of the amendment because the amendment restates existing law.

The amendment essentially echoes the opinion of Chief Judge, now Justice, Stephen Breyer in *United States v. Rivera,* 994 F.2d 942 (1st Cir.1993). *See United States v. Goff,* 20 F.3d 918, 919–20 & n. 1 (8th Cir.1994) (favorably citing *Rivera* but noting that the Eighth Circuit had not adopted the deferential standard of review suggested in *Rivera* ); *United States v. Simpson,* 7 F.3d 813, 820 (8th Cir.1993) (commenting favorably upon *Rivera* ). Indeed, the government explicitly adopts Justice Breyer's analytical method in this case. (Br.Opp'n Defs.' Mot. Downward Departure at 2–3: "[The *Rivera* method] of determining departures has been favorably adopted by the Eighth Circuit.")

Second, U.S.S.G. § 5K2.0, p.s., implements 18 U.S.C. § 3553(b) by permitting a departure where a judge determines " 'that there

---

**6.** Unlike N. Vue, V. Vue's immigration papers do not contain an INS "camp interview form," the document in which the government assesses whether the refugee's fears about persecution are well-founded. The government provided no explanation for the absence of this document when the immigration papers were offered into evidence.

exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" U.S.S.G. § 5K2.0, p.s. (quoting 18 U.S.C. § 3553(b)).

Thus, the pertinent statute and the Guidelines contemplate a departure where: (1) a mitigating factor exists *in kind* which was not adequately considered by the Commission, *or* (2) a mitigating factor exists *in degree* which was not considered by the Commission, *and* (3) the mitigating factor, whether in kind or degree, is important to the statutory purposes of sentencing (which are described in 18 U.S.C. § 3553(a)).

■ Third, the United States Court of Appeals for the Eighth Circuit has recognized that a combination of factors, even those not ordinarily relevant to sentencing, may justify a departure where the offender has consistently tried to lead a decent life in the face of adversity. *United States v. One Star*, 9 F.3d 60, 61 (8th Cir.1993) (citing *United States v. Big Crow*, 898 F.2d 1326, 1331–32 (8th Cir. 1990)) (affirming downward departure based in part upon "consistent efforts to overcome the difficult conditions of reservation life" and the "unusual mitigating circumstances of life on an Indian reservation" from offense level 20 to offense level 8 and a resulting probationary sentence). In my view, these "Indian reservation" cases are properly read to mean that an extraordinarily harsh environment *and* consistent efforts by the offender to overcome that environment in order to lead a decent life may justify a departure.[7]

■ Fourth, the United States Court of Appeals for the Eighth Circuit has established a three-part test to determine whether a departure is appropriate. *See, e.g., United States v. Haversat*, 22 F.3d 790, 794 (8th Cir.1994). I must: (1) determine whether the circumstance relied upon for departure is sufficiently unusual in kind or degree to warrant departure; (2) determine whether as a matter of fact the circumstance actually ex-

ists; and (3) assess the "reasonableness" of the extent of the departure. *Id.* In applying this test, I realize that the burden of proof as to facts justifying a reduction of offense levels is on the defendants. *United States v. Rayner*, 2 F.3d 286, 288 (8th Cir. 1993). I have allocated the burden of proof accordingly.

With these factors in mind, I shall apply the Eighth Circuit's three-part test.

## A. UNUSUAL MITIGATING FACTORS IN KIND AND DEGREE

The first question that must be answered is whether the circumstances relied upon for departure are sufficiently unusual in kind or degree to warrant departure. I turn to that issue now.

### (1) WAR REFUGEES DISPLACED BY SERVICE TO DEMOCRATIC IDEALS

■ The defendants' status as war refugees driven from their homeland because of their military service to our country and the democratic interests in Laos is certainly *in kind* a factor not addressed directly or indirectly in the Guidelines. *See, e.g.,* U.S.S.G. §§ 5H1.1–5H1.12 (discussing offender characteristics).

The closest the Guidelines come to addressing this war-refugee characteristic is in U.S.S.G. § 5H1.11. That provision of the Guidelines provides that military service is not ordinarily relevant. However, I do not believe that because section 5H1.11 deems military service ordinarily irrelevant the guideline also intends to prohibit consideration of the much different status of being a displaced refugee because of military service to the country now seeking to punish the refugee. Many people serve in the military. Few people serve the interests of democratic ideals and the interests of another country, are displaced from their homeland as a result, and then find themselves subjected to the criminal laws of the foreign country they served in battle.

---

7. In all candor, I must confess that these "Indian reservation" cases trouble me for a variety of reasons not pertinent to resolution of this case.

In any event, the cases are binding upon me and must be followed.

I acknowledge that I may not consider national origin under the Guidelines. U.S.S.G. § 5H1.10. Whether the defendants come from Laos or some other country is clearly irrelevant. What is relevant is their status as war refugees displaced from their homeland (regardless of where that is) as a result of serving the democratic interests of the country which seeks to impose criminal sanctions. This war-refugee status has nothing to do with inherently invidious distinctions based upon national origin.

Concluding as I do that being a war refugee because of one's service on behalf of the democratic interests of this country is a kind of characteristic not addressed in the Guidelines, the next question is whether such a characteristic is a mitigating factor relevant to the statutory purposes of sentencing which justifies a departure. I conclude that war-refugee status is a mitigating factor relevant to the purposes of sentencing which justifies a departure.

■ To some degree, the Guidelines attempt to implement the principle of "just deserts"; that is, punishment should be scaled to the offender's culpability and the resulting harm. U.S.S.G. Ch. 1, Pt. A(3), at 3 (1993) (discussing the efforts of the United States Sentencing Commission to harmonize the "just-deserts" perception of the purposes of criminal punishment with the "crime-control" perception of the purposes of criminal punishment).[8] Most importantly, the statute is concerned with "just deserts" because it specifically directs a court to consider what is "*just* punishment for the offense." 18 U.S.C. § 3553(a)(2)(A) (emphasis added).

■ If "just deserts" are a statutory sentencing goal, and I conclude that they are, then I am persuaded that it would be unjust to punish these defendants as severely as the average drug criminal. These men were literally forced to come to America to save their lives as a result of serving our interests (and theirs) in their own country. Ironically,

*as a result of their service to democratic principles,* they had no real say in whether they would be judged by their nation's laws or ours. Moreover, and very importantly, the consistent and valiant fight waged by these men for our interests (and theirs) in Laos is every bit as noble and impressive as the efforts of Native Americans who have struggled in the face of adversity to "lead a decent life in a difficult environment." *United States v. Big Crow,* 898 F.2d 1326, 1332 (8th Cir.1990).

It is true, of course, that these men applied to our government to be allowed to come to the United States. They had no reasonable alternative. Had they not asked to be allowed to come to this country, they would have remained in a camp in Thailand or been returned to Laos to face persecution or death. Their decision to be governed by American law was not voluntary in the same sense that an American citizen or, for that matter, most other aliens voluntarily submit to the authority of American law. If these men did not voluntarily consent (in a realistic as opposed to a legalistic sense) to the application of our laws to their lives, but were forced to come to our country because they fought our enemies, then it seems only "just"[9] that we consider treating them less harshly because they are truly less culpable than the average drug offender. These men are unwilling strangers in a strange land. Their exploits during the war in their own country are evidence of a consistent effort to lead a decent life in the face of overwhelming adversity.

### (2) PROFOUND LACK OF EDUCATION AND TRAINING

■ I also conclude that the fact that, due to an utter lack of education and training, these men had virtually no hope of earning a lawful living for themselves or their families when they came to this country presents a circumstance in degree, when considered with their status as war refugees, which

---

8. For example, the concept of a downward "role adjustment" found in U.S.S.G. § 3B1.2 is intended to address situations where the actor is "substantially *less culpable* than the average participant." U.S.S.G. § 3B1.2 Commentary (Background) (emphasis added).

9. Our constitutional tradition is based on the idea that the people give "voluntary consent" to be governed. *See, e.g., Federalist No. 85,* quoted in Clinton Rossiter, *The Federalist Papers* at 527 (1961).

takes this case out of the "heartland" and provides a mitigating factor relevant to the statutory goals of sentencing.

These men are illiterate. They have absolutely no education, and they speak no English. Aside from the military training they received, they know only farming in the remote hills of Laos. They had (and have) many mouths to feed. Neither man has been able to secure employment in this country. It is not an exaggeration to suggest that they had virtually no hope of supporting themselves or their families when they came to the United States.

I recognize that many people are poorly educated. Illiteracy, although not common, is also not unknown in this country. Many people lack job skills. Still others have difficulty with the English language. However, few people are illiterate, lack *any* education, are unable to speak English, know only subsistence farming in the jungles, *and* are forced to come to this country because they served our interests during a war. Viewed in this light, the defendants' complete lack of education and training is unique.

I therefore conclude that this lack of education and training, U.S.S.G. §§ 5H1.2 and 5H1.5, while not ordinarily relevant to sentencing, is sufficiently unique in degree, particularly when viewed in light of the defendants' status as war refugees, to constitute grounds for departure. *United States v. Simpson*, 7 F.3d 813, 820 (8th Cir.1993) (the "factors in any particular case do not exist in isolation. The totality of those individual circumstances may well converge to create the unusual situation not contemplated by the Commission.").

The next question is whether this profound lack of education and training is a mitigating factor relevant to the statutory purposes of sentencing. I conclude that it is.

■ As noted in part II(A)(1) above, the Guidelines and the relevant statute direct the court to consider "just" punishment. It would simply be unjust to punish these men as harshly as most defendants convicted of drug offenses inasmuch as they had virtually no ability to support themselves or their families by lawful means when they came to the United States. This factor is particularly significant when one realizes that they were driven out of their own country, and into ours, because they served our interests. These men are, accordingly, less deserving of punishment than the great bulk of defendants accused of drug crimes.

### (3) LIMITATIONS ON OPINION

In making these findings, I am fully aware that these men were *not* abandoned by our government when they came to this country. Our government provided them with money, advised them of the availability of social services, and informed them of our laws.

■ While these charitable acts by a grateful nation certainly lessened the difficulties the men confronted when they came to this country, these factors are not enough to deny departure altogether. Indeed, the recognition by the court of appeals that Native Americans confront extraordinary problems on government-controlled and -supported reservations which justify departure at times, *United States v. One Star*, 9 F.3d 60, 61 (8th Cir.1993), is also a recognition that certain hurdles in life are simply so overwhelming, *despite the good works of government*, that criminal laws must be merciful to those who have been so challenged. Thus, while I shall consider the efforts of our government to assist these men in determining the extent of the departure, I shall not deny a departure altogether because of such assistance.

I further recognize that these men fought for their own interests in Laos as well as ours. Nothing I have said is intended to suggest that these men were victimized by our government. Nonetheless, it is true that had these men not sided with our government, they would not have been displaced. The fact that they served their own interests in Laos does not detract from the fact that they served our interests as well. It is that service to democratic ideals, and the concomitant sacrifice of involuntary displacement, which justice requires that I consider for purposes of departure.

Moreover, I wish to make it clear that I do not agree that the Guidelines permit me to consider many of the factors identified by

defense counsel as justifications for departure. I shall therefore identify those factors present in this case on which I have placed no particular significance for purposes of departure.

Among other things, I placed no significance on the fact that the defendants are Asian or Hmong (ethnic Chinese). Their race and ethnic background (or national origin) are plainly irrelevant. U.S.S.G. § 5H1.10. *See United States v. Vue,*[10] 13 F.3d 1206, 1212–13 (8th Cir.1994) (district court erred in allowing the introduction of evidence that persons of Hmong origin were likely to be involved in opium smuggling). Likewise, whether the men are rich or poor is irrelevant. U.S.S.G. § 5H1.10.

The defendants' war wounds played no particular part in my decision because of the lack of probative evidence as to whether their wounds were disabling. U.S.S.G. § 5H1.4. Moreover, the Guidelines dictate that drug dependence is not a reason for imposing a sentence below the guideline range. *Id.*

■ The defendants' lack of a criminal history, although certainly not irrelevant, is accounted for in the calculation of their criminal history score and therefore not grounds for departure. *United States v. Big Crow,* 898 F.2d 1326, 1331 (8th Cir.1990). Accordingly, I placed no independent significance on lack of criminal history when considering departure.[11]

The defendants' ages played no particular part in my decision. U.S.S.G. § 5H1.1. Their family ties and responsibilities played no particular part in the departure decision because such ties and responsibilities, although very significant,[12] were not sufficiently unique in kind or degree as to warrant departure.

However, I recognize that context is important. For example, the significance to these men of their complete lack of education and training is made clearer by knowing how old they are and that they are heads of families whose members are, like them, strangers in this country. Thus, I have referred to a variety of factors in this opinion in order to provide a meaningful context, although such factors did not motivate the departure decision.

**B. THE MITIGATING FACTORS EXIST AS A MATTER OF FACT**

I find that the facts set forth in part I of this opinion, and especially the mitigating factors identified in part II(A), exist as a matter of fact.

The government raises only two factual questions which deserve comment. I turn to those factual issues now.[13]

■ First, the government points out that N. Vue now claims to be addicted even though he swore on an immigration form that he was not addicted when he sought admis-

---

10. According to information provided to me by the pretrial services officer, "Vue" is a common Hmong name. *See* note 1.

11. The defendants are also not entitled to a departure because their criminal act was aberrational. The criminal act in this case was not sufficiently spontaneous or thoughtless. *United States v. Premachandra,* 32 F.3d 346, 349 (8th Cir.1994) (because the Sentencing Commission did not consider single acts of aberrant behavior when formulating the Guidelines, a spontaneous and thoughtless act may be the basis for departure). In this case, the quantity of the drugs, coupled with the fact that the drugs were found in a car trunk packaged in "bricks" in separate garment bags, disproves any claim that the criminal act was sufficiently spontaneous or thoughtless as to justify departure on the grounds that the criminal act was "aberrant." Given the defendants' complete lack of criminal history, I

agree that the criminal act was totally out of character for these men. However, as indicated in the text, that fact, while not irrelevant, has been accounted for in the criminal history score.

12. For example, both defendants are apparently good family men. I note that V. Vue's wife wrote a heart-wrenching letter (Ex. 101) to the court. Both men have dependent children, and V. Vue has a large number of dependent children.

13. The questions raised by the government related to answers given to questions on Exhibits 1 and 2, Form I–590. These answers were handwritten in English. Given the fact that the defendants are illiterate (each man signed his immigration documents with an "X" or a fingerprint) and do not speak English, it is clear that the men were interviewed by someone who spoke English and that person filled out the form.

sion to this country. There is no doubt that N. Vue made such a representation in response to an extremely long certification statement if one assumes that he understood the statement and that his answer was translated and understood correctly. I find, however, that the representation is irrelevant for three reasons.

Initially, the representation is irrelevant because drug addiction cannot and has not formed the basis for departure. Whether N. Vue became addicted in America or Laos (or whether he is addicted at all) has not motivated my departure decision. Moreover, even if I assume that N. Vue lied, the lie does not suggest a *relevant* lack of credibility because the mitigating factors identified in this opinion are essentially corroborated by the government's own documents. Finally, if N. Vue lied about his drug addiction in order to enter this country, his lie is understandable, if not laudable, given the alternative he faced if he was not admitted to this country—life in the camps in Thailand.

■■■ Second, the government points out that V. Vue stated on a government form that he had not served in the military. While this is true, it is obviously a mistake. The government's own documents (in computer typeface) classified V. Vue's occupation as "military and farmer." (Ex. 2, Refugee Data Ctr. Doc.) The immigration records also add that between 1971 and 1979 V. Vue had no children "because they were living in forest & under nourished." (Ex. 2, Family Trees Form III Thailand at p. 3 of 4 (n. at bottom of Tree # 2).) In addition, V. Vue produced a picture of himself in a military uniform (Ex. 102), a well-worn military cap (Ex. 104) matching the cap in the photograph, and shoulder epaulets (Ex. 103) matching the epaulets shown in the photo.

I therefore conclude that V. Vue has sufficiently proved he served our military interests in Laos. Indeed, it is highly doubtful he would have been permitted to enter this country if the government had believed otherwise.

## C. EXTENT OF DEPARTURE

■■■ Because I intend to allow the extent of departure to be addressed at sentencing, at this point I shall set forth my thoughts on the extent of the departure only briefly.

First, the causal connection between the reason for the departure and the offense at issue is weak; that is, it cannot be said with assurance that these defendants committed this drug crime because of their status as displaced, uneducated, and untrained war refugees who fought for democratic ideals in Laos. After all, these men received financial assistance when they came to this country and were receiving financial assistance at the time of the offense. This lack of a strong causal connection suggests that the extent of the departure should be modest.

Second, the crime, involving as it does a significant amount of opium, is very serious. The social costs to the nation of illicit drug sales are obviously staggering. Concepts of "just deserts" (as well as crime control) require that serious attention be paid to the "harm" caused or threatened by the offense. U.S.S.G. Ch. 1, Pt. A(3), at 3; 18 U.S.C. § 3553(a)(2)(B) & (C). In turn, the seriousness of the offense suggests that the departure be limited if only to provide appropriate deterrence.

Third, both defendants would benefit from an intensive educational and vocational program. If they do not receive such assistance, there is a good chance that these men will offend again. While educational and vocational programs are limited in prison, the fact that there is no evidence these men sought such assistance when they had the opportunity to do so suggests that a prison sentence is required to forcefully assure their attendance at such educational and vocational programs.[14]

Fourth, if the concept of "just deserts" is relevant to the issue of departure, and, as noted above, I conclude that it is, I must look for a guideline analogy that takes into account the concept of "just deserts." Such an analogy, while obviously not directly relevant to the facts of this case, provides a rational method of predicting what the Sentencing

---

14. The same could be said with regard to N. Vue's need for drug treatment.

**1364**

Commission would have done had it been aware of the unique circumstances which justify the departure.

In this regard, I believe the "minimal" participant role adjustment found in U.S.S.G. § 3B1.2 provides a useful analogy. That Guideline section suggests a four-level decrease in the offense level for cases where the offender is "substantially less culpable than the average participant." U.S.S.G. § 3B1.2 Commentary (Background). For the reasons articulated earlier, I believe these defendants are "substantially less culpable than the average participant," although not because of their "roles" in the offense. Therefore, while these men, given the amount of opium involved, are not entitled to a role reduction, by analogy such a role adjustment provides a useful way to measure the appropriate extent of departure.

### III. CONCLUSION

In summary, I find and conclude that the defendants' status as war refugees driven from their homeland because of their military service to democratic ideals in Laos is a mitigating factor relevant to the statutory purposes of sentencing and is a kind of factor not addressed in the Guidelines. I also find and conclude that the fact that these men had virtually no hope of earning a lawful living for themselves or their families when they entered this country due to their utter lack of education and training presents a circumstance in degree, when considered with their status as war refugees, which takes this case out of the "heartland" and provides a mitigating factor relevant to the statutory goals of sentencing.

Accordingly, I shall depart downward, suggesting to the parties that the appropriate departure is four levels.

IT IS ORDERED that:

(1) The defendants' motions for downward departure (Filings 77 and 80) are granted in part and denied in part, to wit:

    (a) The court shall depart downward pursuant to U.S.S.G. § 5K2.0, p.s., for the reasons articulated in the foregoing memorandum;

    (b) The motions are otherwise denied;

(2) The courtroom deputy is directed to schedule the defendants' sentencing with the interpreter and notify the parties accordingly.