**UNITED STATES of America**

v.

**Stuart SOMERSTEIN and Marianna Somerstein, Defendants.**

**No. CR 96–657(ADS).**

United States District Court, E.D. New York.

Aug. 20, 1998.

Zachary W. Carter, United States Attorney for the Eastern District of New York, Garden City, NY, Daniel Seth Dorsky, Assistant United States Attorney, for U.S.

Stillman & Friedman, New York, NY, Charles A. Stillman, Rebecca Stead, Sara Beth Savage, of Counsel, for Defendant Stuart Somerstein.

Newman & Schwartz, New York, NY, Gustave H. Newman, Annemarie Hassett, of counsel, for Defendant Marianna Somerstein.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Court.

The defendants, Stuart Somerstein ("Stuart") and Marianna Somerstein ("Marianna," collectively the "Somersteins" or the "defendants"), the officers and principals of Somerstein Caterers of Lawrence, Inc. ("Somerstein Caterers" or "SCLI") were convicted after a jury trial as to count one, conspiracy to commit mail fraud and to make false statements; count two, mail fraud; and count three, making false statements in relation to documents required by ERISA. In addition, Stuart Somerstein was convicted of the theft of $155,000 from a private pension plan. The original indictment also charged Sylvia Bromley ("Bromley"), SCLI's former bookkeeper, and John Iacovetti ("Iacovetti"), SCLI's former manager, with related crimes. Bromley died prior to the commencement of trial and the indictment against her was dismissed. The jury acquitted Iacovetti on all counts.

The Probation Department's Report indicates that Stuart Somerstein has a Criminal History Category of I, and an Offense Level of 20, resulting in a sentencing range of 33 to 44 months incarceration. Marianna Somerstein, with a Criminal History Category of I, and an Offense Level of 13, faced a term of incarceration from 12 to 18 months. This opinion addresses three of the sentencing issues confronting the Court: (1) the Government's motion for a 2–level adjustment in the sentences of Marianna and Stuart, pursuant to U.S.S.G. § 3B1.1(c), for their role in the offense, specifically, acting as organizers and leaders who directed the activities of another

criminally responsible participant, namely Bromley; (2) Marianna's motion for a downward departure pursuant to *United States v. Milikowsky*, 65 F.3d 4, 6–9 (2d Cir.1995), on the ground that her imprisonment would impose an "extraordinary hardship" on her employees; and (3) Marianna's motion for a downward departure based on a combination of factors, including her charitable efforts, excellent work record, and experience as a survivor of the Holocaust.

## I.  BACKGROUND: THE OFFENSE

Somerstein Caterers is one of the premier caterers of Long Island. In addition to serving as the in-house caterer for Temple Israel in Lawrence, New York, the corporation operates the well-known Water's Edge Restaurant in Queens, New York. As part of this business, SCLI employs waiters, waitresses, bartenders, cooks, dishwashers, limousine drivers and security and maintenance personnel.  Stuart Somerstein is the president of Somerstein Caterers.  Marianna Somerstein, Stuart's wife, is vice president.  As stated above, Bromley, who is now deceased, was SCLI's bookkeeper.  Iacovetti served as the general manager until 1993.

Somerstein Caterers employs both union and nonunion employees.  These employees are also called "wait staff."  During the trial, the term "wait staff" was defined as waiters, bartenders, captains and head waiters.  Tr. 2184.  The union employees are represented by the Hotel Employees and Restaurant Employees International Union, AFL–CIO ("HEREIU"), a labor organization whose members work in the culinary and hotel industries.  Local 100 ("Local 100" or the "Union") is the regional HEREIU chapter which includes as members restaurant and catering hall employees in the New York metropolitan area, including Long Island.  At all relevant times, Somerstein Caterers was a signatory to collective bargaining agreements with Local 100.

On June 1, 1987, the "1987 collective bargaining agreement" between SCLI and Local 100 went into effect.  Articles IX, XII and XIII of the 1987 collective bargaining agreement required the following benefit contributions be made to various employee benefit funds ("Benefit Funds" or "Funds"):

| Fund | Amount of contributions |
| --- | --- |
| Vacation Fund | $5.00 per employee per party |
| Welfare Fund | $5.00 per employee per party |
| Pension Fund | $2.00 per employee per party |

On June 30, 1990, the parties renegotiated their collective bargaining agreement.  Under this "1990 collective bargaining agreement," the required contributions were identical to those stated in the 1987 agreement, the exception being that the contribution to the Pension Fund was increased from $2.00 to $5.00 per employee per party.

Consistent with the terms of the 1987 and 1990 collective bargaining agreements, Somerstein Caterers filed monthly documents called "remittance reports" with the Benefit Funds.  The reports set forth the number of jobs worked by each employee, the names and social security numbers of the employees and the contributions made on their behalf.  In order to keep track of contributions, the Funds maintain member history reports, which include the number of jobs worked and contributions made by an employer over a specific period of time.  The information contained in these remittance reports is certified by the Benefit Funds in Internal Revenue Form 5500, which is filed annually with the federal government.  According to the prosecution, the collective bargaining agreements required that the remittance reports contain the necessary and accurate information, and the contributions to provide benefits for both union and nonunion employees.

On November 1, 1980, prior to the execution of these collective bargaining agreements, Somerstein Caterers established the "Somerstein Caterers of Lawrence, Inc. Pension Plan" (the "Private Pension Plan").  The Private Pension Plan was developed for the benefit of employees not covered by the HEREIU Benefit Funds.

According to the Government, based on information obtained from audits of Somerstein Caterers, and documents seized during a search, between 1987 and May 1994 the Somersteins conspired to defraud the Local 100 Benefit Funds by failing to pay the required contributions. As part of this scheme the defendants allegedly made false state-

ments and false representations in the remittance reports filed with the Benefits Funds. The prosecution contends that the defendants would intentionally fail to make the required contributions, either by not listing certain employees on the reports or by not reporting all of the parties they catered. In addition, the Government maintains that Stuart Somerstein, acting in his capacity as a trustee, caused the Private Pension Plan to make two loans in the total amount of $155,000 to Somerstein Caterers. According to the prosecution, these transfers constitute an embezzlement and a "prohibited transaction" within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*

The indictment was filed on July 23, 1996, charging all the defendants with conspiracy, mail fraud, and filing false statements with the Benefit Funds. In addition, Stuart Somerstein was charged with embezzlement of funds from the Private Pension Plan. The trial commenced on April 8, 1997 and continued for three and one-half weeks. On April 29, 1997, at the close of the Government's case, the Court granted the defendants' motion for judgment of acquittal pursuant to Fed.R.Crim.P. 29, in part, dismissing those portions of the indictment alleging criminally fraudulent conduct in connection with Somerstein Caterers' failure to make benefit contributions for nonunion employees. On May 3, 1997, the jury returned a verdict convicting Stuart and Marianna Somerstein of conspiracy, mail fraud and filing false documents. Stuart Somerstein also was convicted of embezzling funds from the Private Pension Plan.

## II. THE GOVERNMENT'S MOTION PURSUANT TO U.S.S.G. § 3B1.1(C) FOR A TWO LEVEL ADJUSTMENT IN THE SENTENCES OF MARIANNA AND STUART SOMERSTEIN FOR THEIR ROLE IN THE OFFENSE AS ORGANIZERS OR LEADERS DIRECTING THE CRIMINAL ACTIVITY OF SYLVIA BROMLEY

The Government urges the Court to adopt the Probation Department's recommendation of 2–level enhancement of the defendants' sentences pursuant to U.S.S.G. § 3B1.1(c) for directing the criminal activity of Bromley, SCLI's former bookkeeper. The Court notes that there was little evidence presented at trial pertaining to Bromley, although the original indictment charged her with related crimes, most likely because she died prior to the trial and the indictment against her was dismissed.

### A. U.S.S.G. § 3B1.1(c): The Standard

■ U.S.S.G. § 3B1.1(c) may be applied if it is shown by a preponderance of the evidence that a defendant was an "organizer, leader, manager, or supervisor" of another "criminally responsible participant" in the criminal scheme. *See* U.S.S.G. § 3B1.1; *United States v. Beverly,* 5 F.3d 633, 642 (2d Cir.1993). If § 3B1.1(c) applies, the offense level increases by two. *Id.* "The district court's inquiry is not limited to defendant's role in the count of conviction; rather, the court may take all 'relevant conduct' into account." *United States v. Brinkworth,* 68 F.3d 633 (2d Cir.1995).

### B. The Government's Evidence in Support of the § 3B1.1(c) Enhancement

■ The Court extensively reviewed the trial transcript prior to its decisions denying the motions of both defendants for a judgment of acquittal. The sole references to Bromley in the Court's post-trial Memorandum of Decision and Order are the following:

The testimony and exhibits admitted at trial, as considered in the light most favorable to the Government, demonstrate the following facts. Stuart Somerstein is the President of Somerstein Caterers and Marianna Somerstein is the vice president. Both are active participants in all aspects of the business, both the financial and catering phases. Stuart and Marianna were in total command of the Somerstein catering operation. They were the "bosses" in control of every aspect of the business, including the reporting and payment of employee contributions to the Benefit Funds. *Bromley was a bookkeeper ... but [she] took [her] orders from the Somersteins.* There is evidence that the remit-

tance reports containing false statements were sent out under their direction.

. . .

As part of its records, Somerstein Caterers maintained two sign-in sheets for each party. These sign-in sheets were then later used to fill in the remittance reports. Tr. 1134. One sheet was a list of the union wait staff that worked at the party and the other was for nonunion personnel. *Along with Sylvia Bromley, there is evidence that Marianna oversaw the use of the sign-in sheets and remittance reports by the manager and ensured that they were being maintained correctly.* Tr. 605, 1134–35.

[Robert] Kanowitz [SCLI's former manager], testified [as follows] with respect to maintenance of the remittance reports:

Q    Could you tell us, when were the remittance forms prepared?

A    When I was there I would fill them out either at the end of the shift or no later than the end of the weekend. Most of the time it was done for all the parties at Sunday evening, late after the party had ended, before I went home, sometimes 2:00, 3:00 in the morning.

Q    How did you fill them out? Where did you get the information to fill them out?

A    From the payroll waiter sign-in sheets filled out by the waiters and the bartenders.

Q    When you first started at Somerstein Caterers and filled out the remittance forms, whose names did you place on the remittance forms?

A    In the beginning when I first came there I would put all the waiters and the bartenders for I guess the first two or three parties.

    *    *    *    *    *    *

Q    When you filled out these remittance forms, Mr. Kanowitz, the first three times when you put everybody on it, did anything happen?

A Yes, to the best of my knowledge after the third form that I filled out, I was told that I was doing them incorrectly.

Q    Who told you this?

A *Sylvia Bromley and then Mrs. Somerstein.*

*United States v. Somerstein,* 971 F.Supp. 736, 748–49 (E.D.N.Y.1997)(emphasis added).

A review of the Court's opinion and the trial transcript reveals that while there was ample evidence that Bromley was involved actively in the Somerstein's businesses in her capacity as bookkeeper, and that her responsibilities as a bookkeeper were supervised and directed by the Somersteins, there is a dearth of evidence indicating that Bromley was a "criminally responsible participant." Indeed, as set forth above, the only details of Bromley's activities described in the Court's opinion are of the lawful variety.

The Court is not persuaded by the Government's contention that Bromley was a "criminally responsible participant." This theory rests almost entirely on the Government's interpretation of two, brief portions of the trial transcript which, it is argued, indicate that:(1) Bromley was responsible for submitting the completed Remittance Reports which reflected the number of jobs worked to the Benefit Funds (Tr. 1169–70); and (2) the "evidence in this case clearly showed that she was aware of the fact that Somerstein Caterers was not reporting the total number of jobs that union employees had worked. The search of Somerstein Caterers' offices revealed Remittance Forms that had been filled out, but were never sent into the Benefit Funds (Tr. 2777; GX 40A). Indeed, these forms were found inside a folder labeled 'Union, Not Paid, 1991' in what appeared to be Sylvia Bromley's handwriting." (Government's letter of March 5, 1998, at 9).

However, inspection of the cited portions of the transcript leads the Court to a different conclusion. Kanowitz's testimony, on pages 1169–70 of the trial transcript, is as follows:

Q:    Would you tell us what they [these forms] are?

A:    Union Remittance Forms.

    . . .

Q: And after *you fill out the forms at the end of the night or the end of the weekend,* what did you do with the forms?

A: At the end of the weekend I would take these forms with other papers and they would be brought down to *Marilyn [Heitner, a secretary's] office downstairs and left for her to do whatever she had to do.*

Q: When you came to work at Somerstein Caterers in 1993, where were these forms?

A: These forms were in the desk *in what they referred to as John's old desk, Bob's new desk, inside Marilyn [Heitner's] office.*

(Tr. 1169–70)(emphasis added).

The other portion of the transcript cited by the government relates to the testimony of Helen Ceglia, a Special Agent for the United States Department of Labor, Office of Labor and Racketeering:

Q: Can you tell us what Government's Exhibit 40A is?

A: It is a folder. On the tab of the folder it says: Union, not paid, 1991.

Q: Do you recognize the handwriting that says union not paid, 1991?

A: *I am not positive, but I believe it is Sylvia Bromley.*

Q: Can you tell us, where was that document seized from?

A: *This was seized, I believe, from Marilyn Heitner's office.*

Q: Who is Marilyn Heitner?

A: A secretary employed by Somerstein Caterers of Lawrence.

(Tr. 2777)(emphasis added).

The Court finds that, based on a review of the record, the Government has not established by a preponderance of the evidence that Bromley was a "criminally responsible participant." Contrary to the Government's interpretation of the transcript as indicating that Bromley was responsible for submitting the completed Remittance Reports which reflected the number of jobs worked to the Benefit Funds, the cited testimony makes no mention of Bromley. On the contrary, Kanowitz testified it was he who *"fill[ed] out the forms at the end of the night or the end of the weekend."* The forms were stored, not in Bromley's office, but in *"John's old desk, Bob's new desk, inside Marilyn's office."* Kanowitz also testified that he would bring the forms *"down to Marilyn's office downstairs and left for her to do whatever she had to do"* with them.

Likewise, Ceglia's testimony sheds little light on Bromley's role, since she admitted that she was "not positive" that it was Bromley's handwriting on Government's Exhibit 40A, and that the document was seized from Marilyn Heitner's office, not Bromley's. The Court cannot discern how Special Agent Ceglia arrived at her equivocal "belief" that it may have been Bromley's handwriting on the folder.

In reaching its conclusion, the Court distinguishes the Second Circuit opinion in *Brinkworth,* 68 F.3d 633, *supra,* which the Government cites in support of its theory that the defendants' offense levels should each be increased by two for their "managerial roles." In *Brinkworth,* the defendant was convicted of falsifying tax returns. The Court of Appeals affirmed the district court's conclusion that the defendant supervised his accountant in creating and filing the false returns. In arriving at its determination, the Second Circuit approved of the sentencing court's finding that the accountant was a "criminally responsible participant" because he had knowledge of and participated in the criminal activity. *Id.* at 641. In the district court's view, upheld on appeal, the accountant "knew that certain income reported on the financial statements was not reported on the tax returns, as he himself was the person who did not place the amounts on the returns." *Id.* The accountant was not an "uninformed, 'unwitting' participant on the outskirts of a criminal conspiracy," but rather, "a professional accountant, with specific knowledge that income reported on financial statements ... must be reported on tax returns. Despite this knowledge, [the accountant] did not report some income. Such knowledge makes [the accountant] a 'crimi-

# 460

nally responsible' participant in the tax fraud scheme." *Id.*

In the Court's opinion, Bromley's activities are readily distinguishable from those of the accountant in *Brinkworth,* who "had knowledge of and participated in the criminal activity," and "knew that certain income reported on the financial statements was not reported on the tax returns, as he himself was the person who did not place the amounts on the returns." 68 F.3d at 641. While there was extensive evidence that the Somersteins supervised Bromley in her role as Bookkeeper, there is a paucity of proof that Bromley was a "criminally responsible participant." The Court observes that the Government was afforded the opportunity to supplement the trial evidence by way of a hearing, and it declined to do so. In view of the above, the Court finds that the Government failed to prove this enhancement and declines to adopt the Probation Department's recommendation that there be a 2-level enhancement for both defendants pursuant to U.S.S.G. § 3B1.1(c) for directing the criminal activity of Bromley.

## III. MARIANNA SOMERSTEIN'S MOTION FOR DOWNWARD DEPARTURES

For the reasons stated during the sentencing proceeding, the Court denied Stuart Somerstein's motions for downward departures. After reducing his Offense Level from 20 to 18 upon rejecting the Government's request for a two-level enhancement, the Court sentenced him to a term of 27 months incarceration. The remainder of this opinion addresses only the motion of the defendant Marianna Somerstein for downward departures. With a Criminal History Category of I, and an Offense Level of 13, she faced a term of incarceration ranging from 12 to 18 months.

### A. Downward Departures: The Standard

District courts may depart from the applicable guideline sentencing range if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). "[I]t is axiomatic that departures from the guideline range are appropriate only if the case is atypical or outside of the heartland." *United States v. Young,* 143 F.3d 740 (2d Cir.1998)(citing *Koon v. United States,* 518 U.S. 81, 93–95, 116 S.Ct. 2035, 2043–45, 135 L.Ed.2d 392 [1996]; *United States v. Rogers,* 972 F.2d 489, 493 (2d Cir.1992) ).

■ The Second Circuit has emphasized that a district court not only can, but must, consider the possibility of downward or upward departure "when there are compelling considerations that take the case out of the heartland factors upon which the Guidelines rest." *United States v. Monk,* 15 F.3d 25, 29 (2d Cir.1994). "[D]eparture in the appropriate case ... is essential to the satisfactory functioning of the sentencing system." *United States v. Merritt,* 988 F.2d 1298, 1309 (2d Cir.1993). "[T]he authority to depart provides a 'sensible flexibility' to insure that atypical cases are not shoe-horned into a Guidelines range that is formulated only for typical cases." *United States v. Rogers,* 972 F.2d at 493.

With these standards in mind, the Court will turn its attention to the specific grounds advanced in support of the motion of the defendant Marianna Somerstein for downward departures.

### B. The *Milikowsky* Departure For "Extraordinary Hardship" on Marianna Somerstein's Employees

■ Marianna contends that Somerstein Caterers and its approximately 75 employees will suffer dire consequences if she is incarcerated. In support of her motion for a downward departure on this basis, she supplied the Court with myriad letters and affidavits from customers, employees, and representatives of Temple Israel, all of which illustrate that her daily presence is crucial to the survival of Somerstein Caterers, and that without her, the business will fail. The Court notes that SCLI's vulnerability is greatly worsened because it has suffered a precipitous decline in business

since the Government began prosecuting the Somersteins, evidently a result of customers' uneasiness with booking events while the Somersteins faced the possibility of imprisonment. An additional exacerbating factor is that Court has sentenced Stuart Somerstein, SCLI's president, to 27 months incarceration. Having reviewed the documents presented to the Court and the entire record, the Court finds that Marianna has proved that a departure is warranted because she has demonstrated her total "indispensability to ... the [ ] business[ ]." *United States v. Milikowsky,* 65 F.3d 4, 8 (2d Cir.1995).

In *United States v. Milikowsky,* 65 F.3d 4, the Second Circuit found "extraordinary circumstances" justifying a downward departure where the defendant was a principal in several small steel-related businesses, and was critical in several key areas of the company's operation. The Court of Appeals explained:

Th[e] record, undisputed by the government, allowed the [sentencing] court to conclude that Milikowsky is the only individual with the knowledge, skill, experience, and relationships to run [the companies] on a daily basis: he is the sole buyer of all steel, the only person with the requisite ability and contacts to buy steel at competitive rates, the most successful seller, and the person who deals with [the companies'] customer's and suppliers ... the cost advantage attributable to Milikowsky's steel-buying expertise is virtually the only reason that [the companies] remain[] viable operation[s].

*Milikowsky,* 65 F.3d at 8. In upholding the sentencing court's downward departure, the Second Circuit emphasized the "unrebutted letters and testimony from family members, employees, business associates, and Milikowsky's chief trade creditor attesting to his indispensability to ... the two [] businesses." *Id.* The Court also underscored that "the two companies' dependence on Milikowsky is greatly increased by the companies' extremely precarious financial condition." *Id.*

The evidence at trial and at the sentencing proceeding revealed that Marianna Somerstein is an exceptional business woman, with a virtually unparalleled talent for catering affairs. Hers is the public face of Somerstein Caterers. It is her unique talents, flair, dedication to detail, perfectionism, and responsiveness to customers' needs that draws the clients. She is, in the words of SCLI's former manager, John Iacovetti, "the backbone and creator of Somerstein Caterers. Without her, there will be no more Somerstein Caterers, no more beautiful parties, and most important, jobs for those employees now benefitting [by working there]. Somerstein Caterers will disappear from the face of the earth."

In crediting such opinions, the Court relies on statements from Marianna's employees attesting to how vital her presence is. For example, Barry Rosenthal, General Manager of Somerstein Caterers, writes that:

Since the jury's verdict, business has taken a turn for the worst, [and] clients are afraid to book functions with us, not knowing what the future holds for Somerstein Caterers. The business has survived the past 18 months because both Mr. and Mrs. Somerstein have been available, in person and over the telephone, to assure clients that the business will be alright. Without [their] access to daily operations of business, I am afraid that the business will not survive.

In addition, Michael Rutigliano, the Executive Chef of Somerstein Caterers and the banquet kitchen at The Water's Edge, states that Marianna "spends much time with myself and other members of the kitchen staff discussing how each course is to be prepared and how it is to be presented." These sentiments are echoed by customers, such as Miriam and Andrew Sanello, who write that "One of the main reasons we selected Temple Israel for our daughter's Bat Mitzvah was due to the impeccable reputation of Mrs. Somerstein at Somerstein Caterers...." Another customer, Sheldon Dumain, writes:

In September [of 1997] we held our daughter's wedding at Temple Israel in Lawrence.... My wife and I tend to be organized people and want to take care of things that need to be taken care of well in advance. *The caterer is probably the most important part of the wedding since the*

*location and food are what people tend to recall from their affair.* When I met Mrs. Somerstein, I could not believe how organized she was, how knowledgeable she was and the amount of confidence she built in my wife and myself so that we understood that our affair would be a time to remember for our daughter. Truly it was, much of this due to Mrs. Somerstein's planning, organization and involvement in making decisions for the reception. From the entrance to the ceremony, to the final dessert, she helped us step-by-step work our way through that evening and make our daughter's dream come true. Truly her participation as the lead person for Somerstein Caterers was everything we hoped for. *She is the one factor that brought everything together* (emphasis added).

Year after year, many corporate customers, such as Lehr Construction Corporation, select Somerstein Caterers at the Water's Edge for their parties "specifically because of [Marianna] and Stuart Somerstein." Lehr indicates that if Marianna Somerstein were not there, the company would hold its corporate events elsewhere.

Based on the record presented, the Court finds that Marianna is essential to the survival of Somerstein Caterers. If she were not there, clients would go elsewhere. Catering is a unique business, in that customers planning special events demand the highest quality and great attention. When arranging a once-in-a-lifetime event, such as a wedding, the customers want to deal with Marianna and only Marianna, whose impeccable standards, attention to detail and distinctive catering skills "make the affair." She is not replaceable.

In finding that she is indispensable to the business, the Court observes that here, as in *Milikowsky,* "the [business'] dependence on [her] is greatly increased by the [business'] extremely precarious financial condition." *United States v. Milikowsky,* 65 F.3d at 8. In addition, there is no one else available to assume her duties in her absence, since the Court has sentenced Stuart, SCLI's president, to a term of 27 months incarceration. The record reveals and the Court finds that incarcerating Marianna will impose a grave

hardship on the employees, and with reasonable certainty, will leave them jobless. In the Court's view, this is precisely the sort of extraordinary circumstance contemplated in *Milikowsky.* Marianna is the "only individual with the knowledge, skill, experience, and relationships to run [Somerstein Caterers] on a daily basis [and] is virtually the only reason that [the company] remains [a] viable operation." *Id.*

For the foregoing reasons, the Court grants Marianna Somerstein's motion for a downward departure based on the extraordinary hardship her incarceration would impose on Somerstein Caterer's employees, and on the business itself.

### C. The Motion for a Downward Departure Based on a Combination of Factors: Marianna's Experience as a Holocaust Survivor, Charitable Efforts, and Exceptional Work Record

■ The Second Circuit has recognized that "In extraordinary cases ... the district court may downwardly depart when a number of factors that, when considered individually, would not permit a downward departure, combine to create a situation that differs significantly from the 'heartland' cases covered by the guidelines.'" *United States v. Rioux,* 97 F.3d 648, 663 (2d Cir.1996)(quoting U.S.S.G. § 5K2.0 [commentary] ); *see also United States v. Caruso,* 814 F.Supp. 382 (S.D.N.Y.1993)("although the defendant's age, military service, medical problems, good employment record, and likely future compliance with the law might not individually justify departure, the totality of these circumstances represent ground for downward departure here, where 'several characteristics, in combination, were not adequately taken into account by the Sentencing Commission in formulating the Guidelines.'")(quoting *United States v. Cotto,* 793 F.Supp. 64, 66 (E.D.N.Y.1992) ).

For example, in *Rioux,* the Court of Appeals upheld a downward departure of ten points as a result of the defendant's medical condition and good deeds. *United States v. Rioux,* 97 F.3d at 663. In so doing, the Court

acknowledged that physical condition (U.S.S.G. § 5H1.4), and civic, charitable, and public service (U.S.S.G. § 5H1.11) are not ordinarily relevant in determining whether the defendant should receive a downward departure. *Id.* Nevertheless, the Court concluded that the combination of these factors permitted the sentencing judge, in the exercise of discretion, to downwardly depart based on the aggregate of the two otherwise irrelevant factors. *Id.*

■ Here, the Court finds that the presence of three factors, which individually may not justify a downward departure, call out for such a departure when viewed collectively: (1) Marianna Somerstein's charitable efforts; (2) her exceptional work history; and (3) her experiences as a child victim of the Holocaust.

### 1. *Marianna Somerstein's Charitable Efforts and Contributions to the Community*

In support of Marianna's downward departure motion, the Court notes her numerous acts of charity. For example, Marianna caters fund-raising functions without charge or at discounted prices. She also arranges for leftover food to be donated to soup kitchens and shelters. In addition, she volunteers for many organizations, including Easter Seals, Cerebral Palsy, and the United Jewish Appeal. As noted previously, civic, charitable, and public service are not ordinarily relevant in determining whether the defendant should receive a downward departure. *See* U.S.S.G. § 5H1.11. However, the Court considers her good deeds, not in isolation, but in conjunction with the other factors discussed in this sentencing proceeding.

### 2. *Marianna Somerstein's Exceptional Work Habits*

The Court need not reiterate Marianna's exceptional work record, which was set forth in discussing the *Milikowsky* departure. Suffice it to say that she is an exceptionally hardworking person who is devoted to her profession. When on a job, she apparently works around the clock. Once again, while employment history is not, in and of itself, a basis for a downward departure (*see* U.S.S.G.

§ 5H1.11), it nevertheless is an admirable trait which bears recognition when viewed in combination with other factors.

### 3. *Marianna Somersteins' Experiences as a Child Victim of the Holocaust*

In December 1995, prior to the filing of this indictment, the Shoah Research Foundation, a not-for-profit group dedicated to preserving the memories of Holocaust survivors, conducted a videotaped interview of Marianna Somerstein. The Court has viewed this videotape. It is a moving experience. During her interview, Marianna recounted, in compelling detail, the ordeal she went through as a 9–year–old girl when the German Army invaded her native country of Hungary in 1944.

During the interview, Marianna recalled the day when, in late May 1944, the Germans entered her hometown and ordered the Jews to the train station for "deportation" to concentration and labor camps. As she and her family headed to the station, Marianna's father slipped her off the wagon bearing their luggage, and told her to accompany her aunt. Her aunt eventually guided her to a spot where she met the father of a Christian family that had agreed to hide her in exchange for money her father paid to the family. Marianna was hidden by this family for a year. During this time, she was subjected to numerous indignities and verbal abuse by certain members of the household. Marianna's hiding place was under the covers of a bed. She could only leave this place after dark. She was prohibited from ever leaving the house, and was left alone in the home under the bedcovers during the nightly air-raids while the family members were safely ensconced in a bomb shelter. When the Russian Army liberated Hungary in 1945, one of her uncles returned from a concentration camp and found her in hiding. He and Marianna made their way back to her home town to reclaim her family home, which of course had been stripped of all its possessions. She found her entire town had been destroyed, and she had no idea where her parents were or whether they were alive.

Many months later, Marianna's mother and two aunts came home from the labor camps where they had been imprisoned during the war. They later learned that Marianna's father had died in a concentration camp. As some of the other surviving neighbors came home from the concentration and labor camps where they had been imprisoned, they all came to visit Marianna. Marianna was the only Jewish child in the town who survived the war.

In the Court's view, Marianna's experiences as a child-victim of the Holocaust may, in and of itself, warrant a downward departure. The Court finds instructive the case of *United States v. Vue*, 865 F.Supp. 1353, 1354–55 (D.Nebr.1994), where the district court granted two co-defendants' motions for downward departures because they were war refugees who fled their homeland of Laos to avoid the threat of persecution and death in retaliation for supporting the democratic interests of the United States. There, the Court observed that:

> The closest the Guidelines come to addressing this war-refugee characteristic is in U.S.S.G. § 5H1.11. That provision of the Guidelines provides that military service is not ordinarily relevant. However, I do not believe that because section 5H1.11 deems military service ordinarily irrelevant the guideline also intends to prohibit consideration of the much different status of being a displaced refugee . . . .

*Id.* at 1354–55.

The Court concludes that Marianna's experiences as a 9–year–old victim of the Holocaust, when she suffered the loss of half her family, almost her entire home town, all her childhood friends, and lived a horrifying existence in hiding with an abusive family, with the constant threat of detection and death, is extraordinary in every sense of the word. Simply put, the Court cannot see incarcerating this woman for this type of offense after what she has been through. *See United States v. One Star*, 9 F.3d 60 (8th Cir.1993)(upholding a downward departure for possession of a firearm based on a combination of factors, including the defendant's lack of dangerousness, strong family ties, good employment record, and difficulty of life

on an Indian reservation); *United States v. Big Crow*, 898 F.2d 1326 (8th Cir.1990)(upholding district court's downward departure for excellent employment history, solid community ties and consistent efforts to lead a decent life in the difficult environment of an Indian reservation). As the Second Circuit aptly put it, "The United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom." *United States v. Johnson*, 964 F.2d 124, 125 (2d Cir.1992).

In so finding, the Court recognizes that it may not consider religion or ethnic origin under the Guidelines. U.S.S.G. § 5H1.10. Whether Marianna Somerstein is Jewish or not is irrelevant to the imposition of sentence, and the Court has not considered it in any manner. What is relevant is her uniquely devastating experience as a Holocaust survivor. This status has nothing to do with impermissible distinctions based upon religion, but rather, with the unspeakable tragedy she suffered as a child. If she stood before the Court as a survivor who was persecuted during the Holocaust because of her political beliefs, religion, national origin, ethnicity, or sexual orientation, the Court would arrive at the same conclusion. It is her horrendous hardship, not her religion, that moves the Court to recognize this as a factor. *Compare United States v. Sprei*, 145 F.3d 528, 534–35 (2d Cir.1998)(Overturning district court's downward departure because incarcerating the defendant, a member of the Bobov Hasidic community, would deny him the opportunity to fulfill his religious obligation to assist in planning his children's marriages).

Considering the totality of the factors described above, including the *Milikowsky* departure, the Court departs downwardly from an offense level of 13 to an offense level of 10. Accordingly, the Court imposes a sentence of three years probation with the special condition of 6 months home detention, during which time Marianna shall be permitted to leave her home only for work, religious or medical reasons, or to care for her grandson. So that the record is clear, the Court notes that it would have departed downwardly for *either* the *Milikowsky* /"extraordinary

hardship" on her employees, or for the combination of factors, including her charitable efforts, hard work, and experience as a survivor of the Holocaust, and in either circumstance, would have imposed the same sentence.

IT IS SO ORDERED.