

Opinions of the United
States Court of Appeals
for the Third Circuit

8-18-1999

# USA v. Nathan, et. al.

Precedential or Non-Precedential:

Docket 98-6262, 98-6264, & 98-6299

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"USA v. Nathan, et. al." (1999). *1999 Decisions.* Paper 229.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/229

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 18, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 98-6262, 98-6263, 98-6299

UNITED STATES OF AMERICA

v.

DENNIS NATHAN, Appellant in No. 98-6262

(D.C. Crim. No. 96-cr-00127-2)

UNITED STATES OF AMERICA

v.

VICTOR ARON LANDER, Appellant in No. 98-6263

(D.C. Crim. No. 96-cr-00127-3)

UNITED STATES OF AMERICA

v.

ELECTRODYNE SYSTEMS CORPORATION,
Appellant in No. 98-6299

(D.C. Crim. No. 96-cr-00127-1)

On Appeal From the United States District Court
For the District of New Jersey
District Judge: Honorable Alfred J. Lechner, Jr.

Argued: May 20, 1999

BECKER, Chief Judge, RENDELL and GARTH,
Circuit Judges.

(Filed August 18, 1998)

MICHAEL CRITCHLEY, ESQUIRE
  (ARGUED)
JOHN MICHAEL VAZQUEZ,
  ESQUIRE
354 Main Street
West Orange, NJ 07052

Counsel for Appellant Dennis Nathan

LAWRENCE S. LUSTBERG,
  ESQUIRE (ARGUED)
MARK A. BERMAN, ESQUIRE
Gibbons, Del Deo, Dolan, Griffinger
  & Vecchione
A Professional Corporation
One Riverfront Plaza
Newark, NJ 07102-5497

Counsel for Appellant Victor Aron
Lander

J. BARRY COCOZIELLO, ESQUIRE
  (ARGUED)
LISA J. TREMBLY, ESQUIRE
Podvey, Sachs, Meanor, Catenacci,
  Hildner & Cocoziello
One Riverfront Plaza
Newark, NJ 07102

Counsel for Appellant Electrodyne
Systems Corporation

2

FAITH S. HOCHBERG, ESQUIRE
United States Attorney
GEORGE S. LEONE, ESQUIRE
Assistant United States Attorney
NOEL L. HILLMAN, ESQUIRE
  (ARGUED)
Assistant United States Attorney
970 Broad Street
Newark, NJ 07102

Counsel for Appellee United States of
America

OPINION OF THE COURT

BECKER, Chief Judge.

This opinion addresses a number of sentencing issues presented by the consolidated appeal of three defendants: Dennis Nathan, who pled guilty to importing goods into the United States that were not marked with the country of origin in violation of 18 U.S.C. S 545; Victor Lander, who pled guilty to unlawfully introducing merchandise into the United States in violation of 18 U.S.C. S 542; and Electrodyne Systems Corporation, which pled guilty to violating the Arms Control Export Act, 22 U.S.C.S 2778, and making false statements in violation of 18 U.S.C. S 1001. Only two of the issues are of general interest and precedential value. The first involves the proper definition of a "stipulation" under U.S.S.G. S 1B1.2, the presence of which may take a sentence to a higher guideline level. We conclude that statements made during the factual basis portion of the plea colloquy after the plea agreement has been made are not stipulations for the purpose of section 1B1.2, as such statements cannot be said to be part of a plea agreement. Because the District Court relied on such non-cognizable statements in finding that Nathan and Lander had stipulated to the greater offense of fraud, we will reverse the judgment to the extent that it relied on the fraud guidelines in sentencing the defendants.

The second question concerns whether the president of a defense contracting company occupies a position of trust with regard to the government, an issue we must resolve to decide whether the District Court correctly applied the adjustment for the abuse of a position of trust. We conclude that the District Court's findings that Nathan held a position of trust, and that he breached that trust, are supported by the record and are legally correct. We will therefore affirm the District Court's decision to increase Nathan's base offense level two points on this ground. For these reasons and the reasons that follow in our discussion of the other more fact-bound issues before us, we will affirm in part, reverse in part, and remand to the District Court so that each defendant can be resentenced.

I. Facts and Procedural History

A. The Charges and the Pleas

Electrodyne Systems Corporation, a defense contracting company, specialized in providing military components to the United States government. Nathan was Electrodyne's president and vice-president. Lander was its director of marketing. Between November 1989 and March 1994, Electrodyne entered into six contracts to provide United States government agencies and the United States military--including the National Aeronautics and Space Administration ("NASA") and the United States Air Force--with electronic components to be used in research, communications, radar, and weapons systems. Each contract required Electrodyne to comply with the Buy American Act, 41 U.S.C. S 10a-10d (1988), and in each contract Nathan (on Electrodyne's behalf) represented that Electrodyne (a) intended to manufacture the components in the United States; (b) would not use foreign components; and (c) would not use offshore manufacturing sites.

Despite their contractual and statutory obligations, Nathan and Electrodyne entered into agreements with foreign companies in Russia and the Ukraine to build the components specified in the contracts. In so agreeing, Nathan disclosed to the foreign manufacturers the

4

drawings, specifications, and technology of the contracted-for components. To conceal this plan, Nathan instructed Electrodyne's employees not to disclose the use of foreign components, instructed the foreign manufacturers not to mark the components with the country of manufacture, and directed his own employees to mark the components to make it appear as if they had been manufactured in the United States. Nathan failed to disclose these foreign contracts to the government and failed to register with the State Department as a manufacturer or exporter of defense articles.

A federal grand jury returned a thirteen-count indictment charging Electrodyne, Nathan, and Lander with, inter alia, violating the Arms Export Control Act ("AECA") and the International Traffic in Arms Regulations ("ITAR"), making false or fraudulent claims, and smuggling goods into the United States. A few months later, pursuant to written plea agreements, all three defendants pled guilty to various parts of the indictment. Electrodyne pled guilty to exporting defense-related items in violation of the AECA and to making false statements in violation of 18 U.S.C.S 1001. Nathan pled guilty to Count 12 of the indictment, which alleged that he had illegally imported goods into the United States because he failed to mark the items with the country of origin, in violation of 18 U.S.C. S 545. Lander pled guilty to a one-count information alleging unlawful introduction of merchandise into the commerce of the United States in violation of 18 U.S.C. S 542.

As part of their plea agreements, Nathan and Lander and the government drafted a schedule of stipulations. They stipulated that the applicable sentencing guideline was the smuggling guideline, which is found at section 2T3.1,1 and that the government would not seek an upward departure for either defendant. They also stipulated that Nathan's and Lander's actions did not threaten national security. In Nathan's plea agreement, the government stated that it did not suffer a tax loss as a result of Nathan's conduct. Finally, each of Nathan's and Lander's agreements recited

---

1. Appendix A of the U.S.S.G. lists S 2T3.1 as the applicable guideline section for violations of 18 U.S.C. SS 542 and 545.

5

that the schedule attached to the agreement contained all of their stipulations and that any changes to the agreement had to be in writing and signed by both the defendant and the government.

At the plea hearing for Nathan and Lander, the District Court questioned them on their understanding of the agreement, and then asked each of them to provide a factual basis for the plea, using questions contained in a government plea memorandum. During this questioning, Nathan admitted that, when he entered into a contract with the Naval Research Laboratory ("NRL") to provide it with amplifiers, he knew that Lander had ordered the amplifiers from a Ukrainian company. He also admitted that he had instructed Electrodyne's employees to obscure markings indicating foreign manufacturing and to affix Electrodyne labels to the amplifiers in an effort to deceive the NRL. Lander in turn conceded that Electrodyne had contracted with the Ukrainian company, that he had instructed the Ukrainian manufacturer not to mark the components in a way that indicated where they were made, and that he had informed the manufacturer that Electrodyne would relabel all future shipments of amplifiers to indicate that the amplifiers were made in the United States. Lander admitted that he knowingly assisted Electrodyne in deceiving the United States government.

B. The Sentencing Proceedings

1. The Factual Record

Prior to sentencing, Nathan submitted to the Court a report from Retired Rear Admiral Lawrence Layman of the United States Navy stating that no American troops had been put in danger by Nathan's disclosure of information. In addition, the government researched whether the defendants had divulged any sensitive information and concluded: (i) that they had not revealed sensitive information; (ii) that all relevant information was already in the public domain; and (iii) that the parts supplied by the defendants to the government agencies were not defective. In its sentencing memorandum, the government: (1)

represented that all affected government agencies approved of the plea agreement; (2) conceded that the defendants had taken action to prevent classified material from being disclosed; and (3) noted that some of the components imported by the defendants actually represented a flow of technology into, rather than out of, the United States.

Also prior to sentencing, the U.S. Probation Office submitted a proposed Presentence Investigation Report ("PSI"). The PSI recommended that Nathan and Lander be sentenced under the fraud guidelines (section 2F1.1), rather than the smuggling guidelines (section 2T3.1). The PSI acknowledged that, under section 1B1.2, the more severe fraud guidelines would in normal circumstances apply only if Nathan and Lander stipulated to the greater offense of fraud, but opined that their statements during the District Court's "factual basis" inquiry at the plea hearing were stipulations sufficient to establish fraud offenses. The PSI also suggested that the case was "atypical" under Appendix A of the Guidelines, such that the fraud guidelines might at all events apply. Both Nathan's and Lander's counsel objected to a number of paragraphs in the PSI. In addition, Lander informed the Court that he intended to move for a downward departure at sentencing based upon his status as a political refugee.

The Probation Office issued a revised PSI. The PSI continued to recommend that the fraud guidelines should apply, but now implicitly conceded that the defendant's verbal admissions were not stipulations. For example, the PSI for Lander stated, "Although not a stipulation, the probation office posits that the defendant's verbal admissions, under oath and on the record, are more persuasive or, at least, as binding as a stipulation to a more serious offense." Lander PSI P148 (emphasis added). An addendum to Nathan's revised PSI argued that, if the court applied section 2T3.1 rather than section 2F1.1, Nathan could be subject to an upward departure under section 5K2.0 on the ground that the smuggling guidelines inadequately captured the seriousness of Nathan's offense.

The District Court sentenced Electrodyne to a five year term of probation, $1,000,000 in fines, and restitution to three government agencies, part in cash and part in kind.

7

Electrodyne filed a timely notice of appeal from the judgment on the ground that the corporation lacked the ability to pay such fines. In United States v. Electrodyne Systems Corp., 147 F.3d 250 (3d Cir. 1998) (Electrodyne I), we vacated the $1,000,000 fine and remanded with instructions to the District Court to make more detailed findings on the company's ability to pay.

2. The Present Sentences

At sentencing for Nathan and Lander, both the government and the defendants' attorneys asked the Court to sentence them in accordance with their plea agreements, but the Court declined to do so. It offered two bases for the sentences it was about to impose. First, it found that the parties had stipulated to a more serious offense under section 1B1.2 based on Nathan's and Lander's responses to the questions posed at the plea colloquy. The Court deemed the facts that came out at the colloquy to be "stipulations" to fraud offenses, rendering the fraud guidelines applicable. Second, the Court stated that even if it sentenced the defendants under the smuggling guidelines, it would reach the same ultimate sentence by relying on Application Note 2 of section 2T3.1 and section 5K2.0.

Application Note 2 provides that an upward departure may be warranted where the items for which the defendant evaded paying import duties were items whose import was prohibited or limited, since the duties evaded may not adequately reflect the harm to society. The Court determined that the duties evaded by Nathan and Lander did not adequately reflect the harm to society and that the dismissed counts of the indictment more accurately measured that harm. Finding that Nathan and Lander had shared with the Ukraine and Russia information that was "not generally known," see United States v. Electrodyne Sys. Corp., 28 F. Supp. 2d 213, 268 (D.N.J. 1998) (Electrodyne II), the Court repeatedly stated that the defendants' conduct threatened national security and the safety of United States troops, see, e.g. id. at 262-63, 268, 269, 270. On this basis, the Court departed upward nine levels from section 2T3.1's base offense level of four. The Court also determined that Nathan was in a position of trust vis-a-vis the government

8

because he received military data, and that he abused this trust by sharing the information with foreign manufacturers. It therefore added two points to his offense level in accordance with section 3B1.3. We now describe the actual sentences: first Nathan, then Lander, then Electrodyne.

The District Court concluded that Nathan's base offense level under the fraud guidelines was six; that the loss was between $350,000 and $500,000 and thus, in accordance with the table set out in section 2F1.1(b)(1), Nathan warranted a nine-level increase of his base offense level; that he deserved a two-level increase for more than minimal planning and a four-level increase under section 3B1.1(a) for his role as the leader or organizer of an extensive criminal activity; and that he should receive a three-point reduction for acceptance of responsibility. This calculation led to a total offense level of eighteen, and with a criminal history category of I, the Guideline imprisonment range is 27-33 months. The District Court imposed a thirty-month sentence.

The Court calculated an alternative sentence for Nathan as follows, using the smuggling guidelines: a base offense level of four; an increase of two points for use of sophisticated means; an increase of four points for his role in the offense; an increase of two points for abuse of trust; a nine-level upward departure for the atypical nature of the offense (based on the national security threats resulting from the offense, the violations of the Buy American Act and the AECA, and the fraud that the defendants committed); and a three-point reduction for acceptance of responsibility. The total offense level in the wake of these calculations is also eighteen. As noted above, with a criminal history category of I, the Guidelines imprisonment range is 27-33 months; the thirty-month sentence imposed was mid-range.

The Court determined that Lander's offense level under the fraud guidelines was fourteen: his base offense level was six; the loss was between $350,000 and $500,000, which, under section 2F1.1(b)(1), calls for a nine-level increase of his base offense level; he deserved a two-level increase for more than minimal planning; and he should

9

receive a three-point reduction for acceptance of responsibility. With a criminal history category of I, the Guideline imprisonment range was therefore 15–21 months. The Court sentenced Lander to eighteen months in prison, which was in the middle of that range.

As it did with Nathan, the Court sentenced Lander in the alternative under the smuggling guidelines: it calculated a base offense level of four; an increase of two points for use of sophisticated means; an increase of four points for his role in the offense; a nine-level upward departure for the atypical nature of the offense (based on the security threats seen to have resulted from the offense, the violations of the Buy American Act and the AECA, and the fraud that the defendants committed); and a three-point reduction for acceptance of responsibility, for a total offense level of thirteen. The applicable imprisonment range under the smuggling guideline was 12–18 months, so the Court's eighteen-month sentence was at the very top of that range.

Before re-sentencing, Electrodyne argued—and the government agreed—that the appropriate loss amount was $189,255.65. Nevertheless, the District Court, referencing the PSI's statement that Electrodyne had stipulated to paying $369,105.70 in restitution, concluded that the restitution amount served as an appropriate measure of loss. The District Court calculated that the restitution broke down as follows: $170,660 was for investigation and reprocurement costs associated with two Air Force contracts; $139,200 reflected the value of a settlement agreement between the Air Force and Electrodyne relating to one of the contracts, because the settlement agreement had been canceled as a result of the plea agreement; $2000 was to go to the Naval Research Lab ("NRL"); and either (a) $14,595.65 plus three converters or (b) $42,650.05 plus one converter was to go to NASA.2 The Court also ordered Electrodyne to pay $500,000 in fines.

All three defendants appeal from the District Court's sentencing determinations. We have jurisdiction under 28

2. The District Court stated that the total amount of restitution could be paid by the defendants collectively. Electrodyne appears to have assumed full responsibility for paying restitution.

10

U.S.C. S 1291 and 18 U.S.C. S 3742(a). Nathan and Lander argue that the District Court erred in applying the fraud guidelines since, they contend, their factual basis statements did not constitute a stipulation to the greater offense of fraud. Second, assuming that the District Court did err in using the fraud guidelines, they submit that the Court abused its discretion in departing upward under the smuggling guidelines and section 5K2.0. Nathan contests the District Court's conclusion that he abused a position of trust. Lander objects to the Court's decision not to depart downward based on his status as a political refugee. Electrodyne argues that the District Court overvalued the loss the company caused to the government and that the Court erred in concluding that Electrodyne had the current or future ability to pay any amount over $140,000. Each defendant argues that, on remand, we should assign the case to a different judge.

II. Nathan and Lander

A. Sentencing Under Section 2F1.1 (Fraud Guidelines):
Was There a "Stipulation"?

A court must sentence a defendant under the guideline most applicable to the offense of conviction (here, smuggling) unless: (1) as explained in Appendix A of the Guidelines, the case is an "atypical" case such that the guideline section indicated for the statute of conviction is inappropriate for the particular conduct involved; or (2) under U.S.S.G. S 1B1.2(a), the parties stipulated to a more serious offense in a written or oral plea agreement.

The relevant smuggling guideline's introductory commentary states: "This Subpart deals with violations of 18 U.S.C. SS 496, 541–45, 547, 548 . . . and is designed to address violations involving revenue collection or trade regulation." The text of the section 2T3.1 guideline states:

> (a) Base Offense Level:
>
> (1) The level from S2T4.1 (Tax Table) corresponding to the tax loss, if the tax loss exceeded $1,000; or

11

> (2) 5, if the tax loss exceeded $100 but did not exceed $1,000; or
>
> (3) 4, if the tax loss did not exceed $100.
>
> For purposes of this guideline, the "tax loss" is the amount of the duty.

U.S.S.G. S 2T3.1. While the District Court expressly determined that this case was not "atypical" in the context of Appendix A, see Electrodyne II, 28 F. Supp. 2d at 244–45, it did find that Nathan's and Lander's answers to the factual basis questions were stipulations to fraud (which the Guidelines treat more seriously than smuggling) and thus that section 2F1.1 was the proper sentencing guideline.

We must perforce determine whether the District Court erred as a matter of law by treating Nathan's and Lander's oral statements at the factual basis hearing as "stipulations," an issue over which we have plenary review. See United States v. Morelli, 169 F.3d 798, 803 (3d Cir. 1999). This Court has not yet determined what constitutes a stipulation for the purpose of U.S.S.G. S 1B1.2(a). If the statements on which the District Court based itsfinding of fraud were not stipulations, then it erred in applying the fraud guidelines rather than the smuggling guidelines.

Nathan and Lander contend that: (i) the PSI conceded that their statements at the hearing were not stipulations; (ii) the plea agreement and its attendant stipulations contained a "four corners" provision that all stipulations between the parties were contained therein and could only be modified in writing; and (iii) they never signed the plea memorandum from which the government asked its questions at the factual basis colloquy. The government does not argue that the District Court was correct to deem Nathan's and Lander's responses "stipulations"; in fact, it argues only that, since the District Court properly sentenced Nathan under section 2T3.1, we need not resolve this issue. However, the Court clearly relied on the fraud guidelines in sentencing Nathan. See Electrodyne II, 28 F. Supp. 2d at 251 ("Accordingly, the Individual Defendants stipulated to the more serious offense of fraud and Section 2F1.1 is the applicable Guideline."). We therefore must

12

determine the meaning of "stipulation" in the section 1B1.2(a) context.

The Supreme Court was presented with (but did not decide) the meaning of "stipulation" in Braxton v. United States, 500 U.S. 344 (1991). The version of section 1B1.2 that existed in 1991 stated:

> Provided, however, in the case of conviction by plea of guilty . . . containing a stipulation that specifically establishes a more serious offense than the offense of conviction, [the court should] determine the offense guideline section . . . most applicable to the stipulated offense.

U.S.S.G. S 1B1.2(a) (emphasis added). In Braxton, the defendant pled guilty to assault but not to attempted murder, though there was no formal plea agreement. Nevertheless, he agreed with the version of the facts proffered by the government at the plea hearing, which facts included a basis for an attempted murder charge. The district court, which sentenced him under the attempted murder guidelines, found--and the court of appeals agreed--that the defendant had stipulated to the more serious charge. Before the Supreme Court, the defendant argued that a stipulation had to be part of a formal plea agreement. The Court acknowledged a circuit split on the meaning of "stipulation" but declined to resolve the question, since the Sentencing Commission had just requested public comment on whether section 1B1.2(a) should be "amended to provide expressly that such a stipulation must be as part of a formal plea agreement." See Braxton, 500 U.S. at 348 (quoting 56 Fed. Reg. 1891 (1991)).

In 1991, the Sentencing Commission amended section 1B1.2(a) to read:

> [A court must determine] the offense guideline section . . . most applicable to the offense of conviction. . . . Provided, however, in the case of a plea agreement (written or made orally on the record) containing a stipulation that specifically establishes a more serious offense than the offense of conviction, [the court must]

13

        determine the offense guideline section . . . most
        applicable to the stipulated offense.

U.S.S.G. S 1B1.2(a) (emphasis added); U.S.S.G. App. C,
amend. 434. Application Note 1 to this section provides:

        Where a stipulation . . . made between the parties on
        the record during a plea proceeding specifically
        establishes facts that prove a more serious offense or
        offenses than the offense or offenses of conviction, the
        court is to apply the guideline most applicable to the
        more serious offense or offenses established.

Id. at application note 1.

Section 6B1.4 of the Guidelines, which governs
stipulations, states, "A plea agreement may be accompanied
by a written stipulation of facts relevant to sentencing." See
id. S 6B1.4(a) (emphasis added). The Commentary to this
section notes that

        [b]ecause of the importance of the stipulations and the
        potential complexity of the factors that can affect the
        determination of sentences, stipulations ordinarily
        should be in writing. However, exceptions to this
        practice may be allowed by local rule. The Commission
        intends to pay particular attention to this aspect of the
        plea agreement procedure as experience under the
        guidelines develops.

Id. (emphasis added). Though the Commission has not
foreclosed the possibility that stipulations may be oral, it
clearly favors written stipulations over oral ones. 3

While neither the language of section 1B1.2(a) itself nor
the language of section 6B1.4 is dispositive of whether
Nathan's and Lander's statements during the factual basis
were stipulations, section 1B1.2(a)'s reference to a
stipulation as something contained within the plea
agreement strongly suggests that statements made in
factual basis colloquies are not stipulations. Section
1B1.2(a) speaks of stipulations as part of a plea agreement.
A scrupulous reading of section 1B1.2(a), which will require

_____

3. We note that the District Court for the District of New Jersey has not
established local rules providing for oral stipulations.

14

that all of the defendant's stipulations be either part of or annexed to his plea agreement, would provide notice to the defendant as to exactly what facts underlying his offense he is agreeing to and will ensure that the defendant receives the benefit of his bargain. In addition, though section 1B1.2 itself provides for oral plea agreements and, presumably, oral stipulations contained therein, the Guidelines favor written stipulations over oral ones. The Application Note also suggests that we should give a common sense reading to "stipulation," such that it refers to situations in which both parties specifically and explicitly agree, on the record, to the truth of the relevant facts. We thus think the language of the Guidelines compels the conclusion that Nathan's and Lander's statements should not be construed as stipulations.

We find support for our position in the caselaw, especially in United States v. Guerrero, 863 F.2d 245 (2d Cir. 1988). Guerrero held that a stipulation between the government and defense counsel, entered into to obviate fact-finding at a sentencing hearing, did not trigger the proviso of section 1B1.2(a). The court explained that section 1B1.2(a)

> applies only to a stipulation contained in a plea of guilty or nolo contendere, not to a stipulation negotiated after a plea in connection with sentencing. Prior to plea, the prosecution has the opportunity to condition its willingness to accept a plea to less than all counts of an indictment on the defendant's willingness to stipulate that he committed crimes in addition to those to which he is pleading guilty. In offering to reduce the defendant's maximum exposure to the penalties in the conviction counts, the prosecution is entitled to extract an admission of facts that may justify a substantial sentence within that maximum. But once the Government agrees to a plea bargain without extracting such an admission, facts admitted by the defendant to shorten or obviate a sentencing hearing do not establish a "stipulated offense" within the meaning of section 1B1.2(a).

Id. at 248; see also United States v. Gardner, 940 F.2d 587, 591 (10th Cir. 1991) (requiring a "knowing agreement by

15

the defendant, as part of a plea bargain, that facts supporting a more serious offense occurred and could be presented to the court" for the court to apply section 1B1.2(a)); United States v. McCall, 915 F.2d 811, 816 n.4 (2d Cir. 1990) (requiring that any stipulation be part of the plea agreement itself); United States v. Rutter, 897 F.2d 1558, 1561 (10th Cir. 1990) (explaining that once the government agrees to a plea bargain without extracting an admission, facts admitted by the defendant can be considered only as relevant conduct in determining the appropriate guideline range, not as stipulations under section 1B1.2(a)). But see United States v. Loos, 165 F.3d 504, 508 (7th Cir. 1998) (concluding that the objective behind section 1B1.2(a) is best achieved by reading "stipulation" to mean any acknowledgment by the defendant that he committed the acts that justify use of the more serious guideline), cert. denied, 119 S. Ct. 1090 (1999); United States v. Domino, 62 F.3d 716, 722 (5th Cir. 1995) (assuming that the factual resume--the equivalent of the "factual basis" in this case--can contain stipulations).

In this case, where the parties drafted and agreed to a document that explicitly contained all of the relevant stipulations between them, it is clear that their"deal" encompassed only those stipulations contained in that document. Though it is true that Nathan, Lander, and their attorneys had, in advance, read the plea memorandum from which the government asked its questions at the factual basis, see Electrodyne II, 28 F. Supp. 2d at 228 n.20 & 231 n.22, the defendants never signed it or in any other way assented to it. Here the facts at issue came out at the plea hearing itself while the judge was deciding whether to accept the plea, rather than in negotiations after the plea had been accepted, as in Guerrero. We nevertheless conclude that the plea agreements between the government and the defendants were complete before the factual basis hearing, and that the facts admitted in the factual basis hearing were in no way part of the government's "deal" with Nathan and Lander. We also think it significant that the government did not attempt to defend the District Court's determination that Nathan's and Lander's comments were stipulations.

16

In sum, we conclude that the text of section 1B1.2(a), examined especially in light of the changes the Commission made from the earlier version of that section, indicates that a statement is a "stipulation" only if: (i) it is part of a defendant's written plea agreement; (ii) it is explicitly annexed thereto; or (iii) both the government and the defendant explicitly agree at a factual basis hearing that the facts being put on the record are stipulations that might subject a defendant to the provisions of section 1B1.2(a). Nathan's and Lander's statements at the factual basis hearing do not meet this definition of "stipulation," and we conclude that the District Court erred infinding otherwise.

Because the District Court rejected the only other ground on which it could have relied to invoke the fraud guidelines when it concluded that the defendants' case was not atypical under Appendix A of the Guidelines, we hold that the District Court erred in applying the fraud guidelines in sentencing Nathan and Lander. In light of this, we examine whether he correctly sentenced Nathan and Lander in the alternative using the smuggling guidelines.

B. Sentencing Under Section 2T3.1 (Smuggling Guidelines)

As noted above, after sentencing Nathan and Lander under the fraud guidelines, the District Court held that even if the defendants did not stipulate to fraud, it would have reached the same sentence had it used the smuggling guidelines, which were the guidelines to which the defendants had stipulated. See Electrodyne II , 28 F. Supp. 2d at 272. Because a court may properly sentence in the alternative, we must analyze the propriety of the sentence under section 2T3.1. See United States v. Bermingham, 855 F.2d 925, 934–35 (2d Cir. 1988) (noting that a court may still affirm a sentence despite an alleged error in the application of the Guidelines when it is clear that the sentencing judge would have imposed the same sentence under the alternative Guidelines scheme proposed); see also United States v. Barnes, No. 98–50418, 1999 WL 459223 (9th Cir. June 30, 1999) (reviewing each of two alternative Guidelines grounds on which District Court sentenced defendant); United States v. Gonzalez-Lopez, 911

17

F.2d 542 (11th Cir. 1990) (considering both of District Court's alternative grounds for sentencing and reversing on both grounds).

Having invoked the smuggling guidelines, the District Court found that an upward departure under section 5K2.0 was appropriate based on the "seriousness of the offenses." Electrodyne II, 28 F. Supp. 2d at 266. The Court relied on Application Note 2 to section 2T3.1, which states:

> Particular attention should be given to those items for which entry is prohibited, limited, or restricted. Especially when such items are harmful or protective quotas are in effect, the duties evaded on such items may not adequately reflect the harm to society or protected industries resulting from their importation. In such instances, an upward departure may be warranted.

Id. The Court concluded that the duties evaded by the defendants did not adequately measure the harm they caused. Specifically, the Court found that four aspects of the defendants' conduct rendered this case an "atypical" smuggling case: the fact that the defendants defrauded the government for their own financial gain; the fact that the actions of the defendants compromised and may in the future compromise the national security of the United States; the fact that they violated the AECA; and the fact that they violated the Buy American Act, which permitted them to gain an unfair financial advantage over those companies that complied with the statute. The Court appears to have used the fraud guidelines as a framework to help it determine how large an upward departure to impose, since it reached a total offense level of 18 under the smuggling guidelines, just as it did under the fraud guidelines.

Nathan and Lander object to the upward departure for several reasons. First, the Court earlier had found that this case was not atypical under section 2T3.1, and so should not have departed upwards in light of the Commentary to section 5K2.0, which requires that a case be "sufficiently atypical" before a court may depart upward. Second, the Court's four bases for an upward departure--that Nathan

18

and Lander defrauded the government for their own financial gain, that they violated the BAA, that they violated the AECA and the regulations promulgated thereunder, and most importantly that their actions threatened the operational integrity of the United States military--were either not factually supported by the record or could not be said to render their offense atypical. Third, even if one of the four bases was a proper basis on which to upwardly depart, they argue that we must remand for resentencing under Koon v. United States, 518 U.S. 81, 98-99 (1996), since the other bases were improper.

The government responds that the Court properly relied on Application Note 2 to section 2T3.1 to conclude that acts like those committed by the defendant warranted an upward departure. The government stresses that the components at issue here were, contrary to the defendants' assertions, "prohibited, limited, or restricted" under 19 U.S.C. S 1304(d), which says that items that do not bear proper markings may not be brought into United States commerce. It submits that, because of the prohibited nature of the components, Application Note 2 suggests that an upward departure may be warranted. Nevertheless, the government also acknowledges that it never alleged that the defendants' actions posed any threat to national security.

Section 5K2.0 states:

> Under 18 U.S.C. S 3553(b), the sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds that "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

Id. The Commentary to this section requires that the case be "sufficiently atypical" before a departure is warranted. As a preliminary matter, we note an anomaly in this case. In discussing whether the case was sufficiently atypical to take it out of the smuggling guidelines under the terms of Appendix A, the Court found that, because the smuggling guidelines intended to target offenses involving revenue

19

collection or trade regulation, Nathan's case was not atypical.4 It stated, "Accordingly, the instant matter is not atypical as to the Guideline section ordinarily applicable to the offense of conviction." Electrodyne II, 28 F. Supp. 2d at 245. For the Court to later find that the case is sufficiently atypical to warrant an upward departure is enigmatic. We believe that the Court's later decision can be reconciled on the theory that it thought the case was mechanically similar enough to a typical smuggling case for it to fall within the smuggling guidelines, but was so much more offensive than most smuggling cases that an upward departure was warranted.

At all events, the District Court decided that the case was sufficiently atypical that it would depart upward from the base offense level. We must examine the bases for the District Court's departure under section 5K2.0 under an abuse of discretion standard. See Koon, 581 U.S. at 97–98. The dominant basis for the District Court's upward departure was its conviction that the defendants had threatened the national security of the United States. At the sentencing hearing, the District Court stated:

> I find the position [that there was no threat to national security or the safety of any member of the military] laughable. . . . Maybe [there was no threat to national security] on a strategic basis, but for the ships' crews, the troops in place, for the pilots, it certainly did. I think [the government's] position flies in the face of logic and I can't and will not accept it.

Sent. Tr. at 14. In its opinion, the Court wrote, "The actions of the Individual Defendant potentially could have compromised, and in the future may compromise, the operational safety of the military and/or the operational readiness and effectiveness of communications, weapons and radar systems." Electrodyne II, 28 F. Supp. 2d at 268. It repeated this theme several more times. See, e.g., id. at 262–63, 269, 270.

_____

4. The Introductory Commentary to section 2T3.1 states, "This Subpart deals with violations of 18 U.S.C. SS 496, 541–545 . . . and is designed to address violations involving revenue collection or trade regulation."

20

Despite the Court's oft-expressed concern that the defendants' actions posed a current or future threat to national security, its reference to the fact that the defendants shared information with the Ukraine that was not generally known, and its determination that this harm was not adequately captured by the monetary duties evaded by the defendants, there is no support in the record for the District Court's concerns. In fact, the record is uniformly and explicitly to the contrary. The government stipulated that: (a) there were no defects in the products imported by the defendants; (b) no confidential information was disclosed to Russia or the Ukraine; and (c) the defendants' acts posed no threat to national security or the safety of the military.

More importantly, the government consulted each affected government agency before it agreed to accept the defendants' plea agreements, all of which assented. In addition, the government conceded in its sentencing memorandum that the defendants had taken affirmative action to prevent classified material from being disclosed. It also noted that some of the components imported by the defendants represented a flow of technology into, rather than out of, the United States. In sum, the District Court clearly erred to the extent that it found that the defendants' conduct created a threat to national security and it abused its discretion in departing upward on the ground that the defendants' actions threatened national security, since there is no support in the record for that conclusion.

Nor was the District Court correct in using the presence of fraud as a reason to find the instant case atypical. The Court stated, "The focus and intent of the conduct underlying the crimes . . . were to criminally and fraudulently deviate from the contract provisions entered into with the United States Government . . . ." Electrodyne II, 28 F. Supp. 2d at 268. Conceiving of the smuggling as a way to further that fraud, the Court treated the fraud as something that made the defendants' smuggling case atypical.

But this use of fraud is problematic. Smuggling by definition involves some element of fraud, and often occurs

21

to further fraud. The statute to which Lander pled guilty, 18 U.S.C. S 542, states:

> Whoever enters or introduces . . . into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration . . . or by means of any false statement . . . or by means of any false or fraudulent practice . . . shall befined for each offense under this title or imprisoned not more than two years, or both.

Id. Likewise, 18 U.S.C. S 545, to which Nathan pled guilty, states:

> Whoever knowingly and willfully, with intent to defraud the United States . . . passes . . . any false, forged, or fraudulent invoice . . . or [w]hoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law . . . [s]hall be fined under this title . . . .

Id. A number of courts have noted that "the intent to defraud element of that statute should be construed as meaning intent to avoid and defeat the United States customs laws . . . rather than the narrower construction `intent to deprive the United States of revenue.' " See United States v. Robinson, 147 F.3d 851, 853 (9th Cir. 1998), cert. denied, 119 S. Ct. 1249 (1999); see also United States v. Borello, 766 F.2d 46, 51 (2d Cir. 1985). Given that fraud is a critical part of the crime of smuggling, the mere fact that Nathan and Lander engaged in fraud as part of their smuggling violation does not render the smuggling atypical.

Third, the District Court's upward departure was in part based on the defendants' violations of the AECA and the ITAR, violations that the Court found had been established by a preponderance of the evidence. See Electrodyne II, 28 F. Supp. 2d at 269-70. However, as with fraud, the fact that the defendants' smuggling scheme also violated the AECA does not render their smuggling atypical. The AECA provides that "no defense articles or defense services . . . may be exported or imported without a license for such export or import . . . ." 22 U.S.C.S 2778(b)(2). The smuggling offenses to which Nathan and Lander pled guilty included this self-same conduct: knowingly and willfully

22

bringing certain merchandise into the United States contrary to law or introducing such merchandise into the commerce of the United States by means of a false or fraudulent practice. A violation of the AECA is arguably the archetypal smuggling offense.

To the extent that there is anything about a violation of the AECA that makes such act an atypical smuggling offense, it is the fact that the AECA applies only to defense articles and services, to which national security concerns may attach. However, as discussed supra, any violations of national security in this case are chimerical. Therefore, the District Court abused its discretion to the extent that it relied on the presence of an AECA violation to find this case to be an atypical smuggling case.

Finally, the District Court stated that the defendants' violations of the Buy American Act created additional harm that was not accounted for under the smuggling guidelines, thereby rendering the case atypical. See Electrodyne II, 28 F. Supp. 2d at 270. The Court reasoned that Congress enacted the BAA to protect American labor and industry, that the defendants received an unfair commercial advantage by using cheaper manufacturers abroad, and that they profited financially from this advantage. The BAA is a civil statute, and the penalty for its violation is simply that a contractor shall not be awarded such contracts for three years after the violation is detected. See 41 U.S.C. S 10b. This facet of the sentencing decision appears to be only a small factor in the upward departure, given the Court's emphasis on the threat to national security, as well as fraud. At all events, to the extent that the BAA, standing alone, would be a ground for upward departure, it could not begin to support one of the magnitude applied here.

Because the District Court improperly determined that national security concerns, fraud, and an AECA violation rendered this case an atypical smuggling case, we will vacate Nathan's and Lander's sentences under the smuggling guidelines and remand for further sentencing proceedings. The District Court may consider on remand whether their violations of the BAA caused harm to "society or protected industries" to an extent not captured by the

23

smuggling guidelines and, if so, whether this factor justifies an upward departure.

C. Abuse of Position of Trust

In determining that Nathan should receive a thirty-month sentence, the District Court concluded that Nathan had abused a position of trust under U.S.S.G. S 3B1.3 and, in accordance with that section, added two points to his total offense level. The Court opined that a double-counting problem would arise if it enhanced Nathan's section 2F1.1 sentence based on abuse of a position of trust, but concluded that it was appropriate to enhance his section 2T3.1 sentence for that factor. See Electrodyne II, 28 F. Supp. 2d at 260 n.80. Under section 3B1.3, the court must find (i) that the defendant was in a position of trust; and (ii) that he abused the position of trust in a manner that significantly facilitated the crime. See United States v. Sokolow, 91 F.3d 396, 412 (3d Cir. 1996).

Nathan argues that he and the government should be treated merely as arm's length parties to a contract, and thus that he held no specific position of trust. He points out that the government assigned Electrodyne a quality assurance representative, who was to monitor Electrodyne's compliance with its government contracts. He also submits that if he held such a position of trust, that position did not facilitate the offenses here. The Court found significant facilitation based on the fact that Nathan was able to provide plans to Russia and the Ukraine for the components in question, but Nathan reminds us that those plans were public. And to the extent that the Court found facilitation based on Nathan's order to his employees that they conceal foreign markings, he contends that this offense was included in the "role in the offense" adjustment and that to consider it here would be double-counting.

The government responds that the quality assurance representative was not assigned to oversee the contracts in question here. It also notes that Nathan's position allowed him to cover his tracks by directing employees to cover over foreign markings, and it contends that the District Court's finding on this point does not constitute double-counting

because the two different enhancements serve different sentencing goals: the aggravating role targets those whose conduct uses others to create more extensive harm, while the abuse of trust role targets those defendants who abuse their own positions. The government argues that we can affirm on the ground that Nathan's abuse of trust consisted of instructing his employees to cover foreign markings, and that we need not address whether Nathan abused his trust by transferring military data.

We review de novo whether Nathan occupied a position of trust, and we review for clear error whether he used his position of trust to significantly facilitate the offense. See id.

1. Existence of a Position of Trust

In deciding whether a defendant holds a position of trust, a court must consider:

> (1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position.

United States v. Pardo, 25 F.3d 1187, 1192 (3d Cir. 1994). Application Note 1 to section 3B1.3 states:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.

S 3B1.3 application note 1. The Court found that Nathan's position allowed him to commit hard-to-detect crimes, since he was able to breach contracts without interference from superiors and was able to conceal those breaches through instructions to subordinates. (Though it also found that the government had relied on Nathan's integrity in revealing military information to him, this finding has no potency in

25

light of the fact that the information was already in the public domain.) The Court took note of the fact that Nathan submitted to the government an agreement acknowledging all of his responsibilities under United States export control laws and stating that he would not provide access to critical military data to persons other than Electrodyne's employees without Department of Defense consent.

We have frequently determined that individuals who held high positions in their companies had positions of trust. For example, in Sokolow, we concluded that the defendant, as president and owner of his company, held a position of trust because he "was able to commit difficult-to-detect wrongs, as he had sole control over [the company's] accounts without oversight or supervision." Sokolow, 91 F.3d at 413. We also noted that he had the authority to withdraw his victims' funds from his company and that such authority was necessary to complete the offense. See id. Nathan similarly had the authority to determine how his company would fulfill its contracts, which authority was critical to the success of his fraud.

In United States v. Bennett, 161 F.3d 171 (3d Cir. 1998), petition for cert. filed, 67 U.S.L.W. 3758 (U.S. June 4, 1999) (No. 98-1957), we held that the defendant, who held a fiduciary position "as president and sole director of the . . . organizations" and who possessed "absolute control over the organizations," id. at 195, held a position of trust. The defendant created a phony board of directors, invented benefactors, and used the contributions for his own businesses. The court concluded that his victims--donors who were told that their money would be used for charitable purposes--trusted him and that his position enabled him to abuse that trust. See id. at 196. Like Bennett, Nathan held the highest position in the company, managed to conceal the breaches of contract forfive years, and owned a controlling block of stock.

In analyzing whether a defendant held a position of trust in a contracting situation, courts have given weight to whether the victim reposed additional trust in the defendant by ceding its ability to confirm compliance with the contract, thus relying more heavily on the honesty of the defendant than an ordinary party to a contract would.

26

In a government contract case, United States v. Glymph, 96 F.3d 722 (4th Cir. 1996), the Fourth Circuit concluded that a defense contractor who was allowed to certify his own compliance with his contract with the Department of Defense ("DoD") deserved an abuse of position of trust enhancement. The defendant, who was convicted of knowingly supplying to the DoD parts that did not conform to the agency's specifications, owned a company that was approved to participate in the DoD's "Alternate Release Procedure." This procedure allowed the company to ship parts without prior inspection by a government quality assurance representative so long as Glymph certified that each shipment had passed the required tests and conformed to the specifications. Though Glymph argued that he was merely an arm's length contractor with the government, the court held that in light of the self-certification procedure and the difficulty in detecting the fraud, he held a position of trust.

Likewise, in United States v. Velez, 168 F.3d 1137 (9th Cir. 1999), the defendant, who operated a private immigration consulting firm, helped aliens file applications with the INS. He also directed a group that was a"qualified designated entity" (QDE), which meant that it had been given statutory authority to assist aliens in preparing legalization applications. Over three years, Velez submitted six thousand applications to the INS, many of which contained false information. At some points in time, the INS was only accepting applications from QDEs. The Ninth Circuit affirmed the district court's conclusion that Velez held a position of trust because of his special status with the INS as a director of a QDE and because his false documents could not be discovered as a matter of routine. See id. at 1139. It also affirmed that he had used his position to facilitate the offense, since he used his status to attract clients and to expedite the filing process at a time when only QDEs could file applications.

Velez is a more clear-cut case than the present one, since Velez had statutory authorization (comparable to an oligopoly) that entitled him to benefits--and responsibilities--other entities did not have. However, like Velez, Nathan had a formal understanding with the

27

government that he would perform certain services in a certain way, and it was difficult for the government to monitor compliance with that understanding. See also United States v. Sherman, 160 F.3d 967, 970 (3d Cir. 1998) (holding that doctor who committed insurance fraud abused a position of trust because the victim-insurer used an honor system and costs to insurer of double-checking doctor's submissions would be prohibitively high).

Much like the defendants in Glymph, Velez, and Sherman, Nathan, as president of the company, was in a unique position to make decisions for the company and to decide how Electrodyne would fill the government contracts. Since no one else--neither the government nor anyone at Electrodyne--was supervising his acts, he held a position that allowed him to commit wrongs, and that permitted him to make those wrongs harder to detect by requiring subordinates to mark over foreign labels and add "Made in the U.S.A." labels. Importantly, the government did not appoint a quality assurance representative to monitor the contracts at issue here, diverging from what appears to be its regular practice; thus, the government vested a significant degree of authority in Nathan. Finally, the government relied on Nathan's integrity not only in opting to contract with him (as the head of Electrodyne), but also in deciding not to assign an enforcement representative to ensure that he was complying with his contracts. Applying this court's abuse of position of trust jurisprudence, which is captured in the tripartite test set forth in Pardo, we conclude that the District Court correctly determined that the government was a victim within the meaning of Sokolow and that accordingly Nathan held a position of trust vis-a-vis the government.5

_____

5. In another government contracting case, United States v. Broderson, 67 F.3d 452 (2d Cir. 1995), the Second Circuit concluded that the defendant, who was an executive at Grumman, did not hold a position of trust. Grumman and NASA had contracted for Grumman to buy a supercomputer and lease it to the government; NASA was to pay fees based on the interest rate Grumman was paying to its bank. Broderson, a vice president of business operations, lied about the rate, charging the government a higher rate than Grumman was paying. This lie violated statutes requiring truth in contracting with the government.

28

2. Abuse of Position of Trust

Since we conclude that Nathan held a position of trust, we must determine whether the evidence supports the conclusion that he used that position of trust to significantly facilitate his crimes. The District Court concluded that he abused his position because he revealed technical plans that had been entrusted to him. As discussed above, none of the evidence suggests that Nathan revealed confidential information. The Court also found, however, that his position allowed him to instruct his employees to paint over marks that identified the goods as made in Russia and the Ukraine and to re-mark the items as made in the United States. We review this finding of fact for clear error. See United States v. Coyle, 63 F.3d 1239, 1250 (3d Cir. 1995).

In United States v. Hickman, 991 F.2d 1110 (3d Cir. 1993), we stated, "To abuse a position of trust, a defendant

_____

The court decided that, though Broderson had discretion, the discretion was entrusted to him by his company, not by the victim agency. See id. at 456 (stating that "whatever `trust' NASA placed in Broderson was based strictly on the explicit commands of" the two relevant statutes he breached). In addition, the court was concerned that the government's theory might cause anyone who, by statute, must make accurate reports to the government (including taxpayers) to be subject to S 3B1.3. Finally, the court found that any abuse of trust that may have occurred was subsumed in the underlying base offense. See id. The court declined to hold that Broderson held a position of trust.

We believe that Broderson is distinguishable both from Glymph and from the instant case. In Glymph, the DoD specifically delegated its inspection responsibilities to Glymph when it allowed him to certify his own compliance with his contract. In Nathan's case, the government essentially relied on Nathan to certify compliance with his contract, since it did not or could not appoint an inspector to comply with the particular set of contracts at issue in this case. In Broderson, the government simply trusted the defendant in the same way that parties to a contract trust each other to comply with the terms thereof. The additional certification responsibilities in Glymph, and the added level of trust by the government in deciding not to install an inspector to watch over Nathan's particular contracts, render those cases worthy of an abuse of trust enhancement.

29

must, by definition, have taken criminal advantage of a trust relationship between himself and his victim." Id. at 1112. In Sokolow, we found such abuse where the defendant's role as president facilitated the commission of the money laundering offenses, and by virtue of his position, he was free to spend the money as he wished. See Sokolow, 91 F.3d at 413. The Sherman court readily concluded that "by virtue of the discretion given to Sherman [a doctor] in his position of trust," he was able to submit medical charges with no supervision, and he abused his position of trust when he submitted bills to the insurance company for services never provided and created fraudulent progress notes to support the fraudulent bills. See Sherman, 160 F.3d at 970. In a similar vein, in United States v. Lieberman, 971 F.2d 989 (3d Cir. 1992), we stated:

> Lieberman stresses that he was only one of 40 vice presidents of the bank, that he merely transferred the funds from one account to another, and that the detection of missing funds occurred in a routine examination. We believe, to the contrary, that the apparent ease with which Lieberman was able to effect the crime over a four-year period shows the nexus between the position of trust which he held and the commission and concealment of the embezzlement.

Id. at 993.

The District Court did not clearly err in concluding that Nathan had abused his position of trust, since Nathan (i) was able to order his employees to help him cover up the telltale signs that his products were not being made in the United States; (ii) could instruct the Ukrainian and Russian companies not to label their products; and (iii) was successful in covering up the operation for five years.

D. Summary

We will reverse the District Court's decision to apply the fraud guidelines to Nathan and Lander. We also will vacate its alternative sentence based on the smuggling guidelines. However, we will remand for the District Court to resentence Nathan and Lander under the smuggling

30

guidelines, cautioning that violations of the BAA cannot merit an upward departure of the magnitude previously imposed. We will affirm to the extent that the District Court concluded that Nathan abused a position of trust. We dispose in the margin of Lander's appeal of the District Court's refusal to grant a departure based on his alleged status as a refugee who fled oppression and religious persecution in the Soviet Union, finding the argument lacking in merit.6

## III. Electrodyne

The District Court calculated that Electrodyne's conduct caused a loss of $369,105.70. "Loss" as defined in the Guidelines represents the loss to the victims before restitution takes place, and is used to set a fine corresponding to the monetary harm caused by the defendants' conduct. The Court imposed a $500,000 fine, which was within the Guideline range for losses of that magnitude, after finding that Electrodyne had the ability to

_____

6. As an initial matter, we must determine whether the District Court recognized its discretion to depart on this ground and declined to do so, or whether it concluded that it was legally precluded from departing. In the letter opinion, which the Court stated would control in cases of conflict with oral statements on the record, the Court discussed Lander's argument that his refugee status was not adequately taken into consideration by the Sentencing Guidelines. The Court considered United States v. Vue, 865 F. Supp. 1353, 1359–60 (D. Neb. 1994), in which the sentencing court granted a departure to defendants convicted of smuggling a large amount of heroin based on the fact that they were refugees from Laos who had been persecuted in their home country for spreading democratic ideals. The Vue court reasoned, inter alia, that the defendants were not voluntarily governed by American law but were forced here because they fought our enemies. The District Court rejected the "reasoning and rationale" of Vue. Electrodyne II, 28 F. Supp. 2d at 274 n.102. Rather, the Court found, Lander lives here and must be governed by our law. While the written opinion is arguably unclear as to the basis of its rejection of Lander's argument, it is supplemented by the sentencing hearing, during which the Court concluded that it had the legal authority to depart on the requested ground. Because the Court recognized its discretion but declined to exercise it, we lack jurisdiction over Lander's appeal on this point, see United States v. McQuilkin, 97 F.3d 723, 729 (3d Cir. 1996), and to that extent it is dismissed.

31

pay such a fine. Our review of the District Court's findings of fact is for clear error. See United States v. Figueroa, 105 F.3d 874, 876 (3d Cir.), cert. denied, 520 U.S. 1248 (1997).

A. The Loss Calculation

Loss must be established by a preponderance of the evidence. See United States v. Evans, 155 F.3d 245, 253 (3d Cir. 1998). Application Note 9 (formerly Note 8) to section 2F1.1 states, however, that a loss need not be determined with precision, but can be a reasonable estimate. Here, where Electrodyne pled guilty to unlawfully exporting defense-related items and to making false statements, we think that its conduct should be treated as loss from fraud rather than loss from theft. In general, the loss from fraud is the financial loss actually suffered by the victim, or the loss that the criminal intended the victim to suffer if that is greater. See United States v. Maurello, 76 F.3d 1304, 1309 (3d Cir. 1996).[7] Because of the nature of the crime, which involved manufacturing fully functional parts, albeit in foreign countries, it is difficult to see what the monetary loss was, though both Electrodyne and the government use the restitution amount as a starting point.[8] Because Electrodyne agrees that some version of the restitution amount is the touchstone for the loss calculation, we direct our attention to that figure.

The District Court found that Electrodyne stipulated to a $369,105.70 loss by stipulating to that amount in

_____

7. The offender's gain is an alternative estimate that, according to the Guidelines, ordinarily understates loss. The PSI attempted to calculate Electrodyne's gain from the fraud, but concluded that it was impossible because the foreign components were just part of the overall assemblies that Electrodyne contracted with the government to deliver.

8. Nathan and Lander argue that Electrodyne's stipulation on restitution did not mean that they themselves had stipulated to an amount of loss attributable to their conduct. Because we have concluded that the District Court should not have used the fraud guidelines, and therefore that the amount of loss should not be used to set the individual defendants' threshold offense levels, and because it appears that Electrodyne has assumed responsibility for any fine, we need not reach this issue.

32

restitution. However, because the restitution agreement contained various provisions, including in-kind transfers, it does not have an obvious face value. Electrodyne offers a loss calculation of $189,255.65, calculated by eliminating two items that the District Court and the Probation Office considered part of the restitution, on the ground that those two items did not reflect any actual or intended loss. The government acceded to Electrodyne's calculation in the District Court, though it argues before us that the Court did not clearly err in finding otherwise. We turn to the specific items whose valuation Electrodyne contests.

1. The Air Force Contract

The first contested item is the District Court's inclusion of $139,200 in the loss calculation, which represented Electrodyne's claim against the Air Force for a canceled contract. Electrodyne represents that this claim arose from a contract pursuant to which Electrodyne had to provide the Air Force with pin diode switches. During the pendency of the criminal investigation, the Air Force canceled the contract, which was one of Electrodyne's two contracts with the Air Force, on the grounds of delay. Electrodynefiled an administrative appeal, arguing that the contract had been canceled for the convenience of the Air Force. The parties reached a tentative settlement that Electrodyne would fulfill the contract and be paid $139,200 if Electrodyne was not convicted. When Electrodyne pled guilty, that settlement became void and the contract was canceled.

The District Court found that the full amount of the $139,200 settlement was part of the "loss" to the Air Force. Therefore, the District Court calculated a total loss to the Air Force of $309,860, which also included $170,660 relating to investigation and reprocurement costs for two contracts: the pin diode contract that was the subject of the settlement agreement and a separate contract for phase shifters. Electrodyne submits that, as a legal matter, the District Court's finding was in error. Our review of what constitutes "loss" is plenary and requires us to look for actual or intended harm to the victim. See Evans, 155 F.3d at 252.

33

The government argues that the $139,200 would have been Electrodyne's but for the plea agreement, and that the money would have been fraudulently acquired. However, the issue is not Electrodyne's potential total gain but the Air Force's actual or intended loss, if any, stemming from the criminal conduct. We have repeatedly emphasized that the amount of loss in a fraud case, unlike that in a theft case, often depends on the actual value received by the defrauded victim. See United States v. Dickler, 64 F.3d 818, 825 (3d Cir. 1995). Thus, when a defendant obtains a secured loan by means of fraudulent representations, the amount of loss is the difference between what the victim paid and the value of the security, because only that amount was actually lost. See United States v. Kopp, 951 F.2d 521, 528–31 (3d Cir. 1991). In a fraudulent procurement case, the principles enunciated in Dickler and Kopp require us to offset the contract price by the actual value of the components provided in order to determine the amount of loss. See United States v. Schneider, 930 F.2d 555, 558 (7th Cir. 1991) (following this procedure in a fraudulent procurement case).

In short, the face value of the contract does not reflect a reliable loss figure because Electrodyne was prepared to provide the components to the Air Force, and the value of those components must be offset against the amount the Air Force agreed to pay. This is true whether we speak of actual or intended loss. The government's argument ignores the value that the Air Force would have received for its money if the settlement had proceeded. That is, if the parties had carried out the agreement, the Air Force would have received pin diode switches that, for all this record shows, were worth $139,200. Because the loss to the government would not have been the full settlement amount, we cannot charge Electrodyne with the full amount as intended loss.

More importantly, the government does not address the argument that the harm suffered by the Air Force was reflected in the $170,660 already attributed to Electrodyne's conduct. The crucial consideration here is that the District Court included the loss attributable to investigation and reprocurement relating to the pin diode

34

switches in its calculation of $170,660 due to the Air Force, independent of the $139,200 in dispute here. See Electrodyne II, 28 F. Supp. 2d at 255 & n.67. Thus, the difference between the value that would have been received by the Air Force and the materials Electrodyne was supposed to have provided has already been taken into account in the $170,660 loss calculation, which included the costs to the Air Force of getting the components from another source.

We find that the settlement amount of $139,200 duplicates the $170,660 for reprocurement and investigation, regardless of whether actual or intended loss is considered. The Air Force only suffered one loss relating to the pin diode switches, and the District Court double-counted that loss when it included both the canceled settlement and the reprocurement. We conclude that the Court erred when it treated this element of the restitution agreement as having value over and above the $170,660 for reprocurement of the items covered by the canceled settlement agreement.

2. The Four Converters for NASA

The District Court adopted the PSI's calculation that the four converters (a type of electronic component) contemplated in Electrodyne's restitution agreement had a value of $57,245.70, the cost of buying four new converters. The restitution agreement provided that Electrodyne would provide NASA with either (1) $14,595.65 and three functioning converters, or (2) $42,650.05 and one functioning converter. The Probation Office apparently added the two dollar amounts together to come up with a total value, presumably on the theory that $14,595.65 was the value of one converter and $42,650.05 was the value of three, although $42,650.05 is not three times $14,595.65. Electrodyne does not challenge the inclusion of the converters' value in the loss calculation as such; rather, it disputes the valuation of particular converters. Thus, we need not address how the converters became part of the loss initially.

The parties agree that two of the converters were already

35

in NASA's possession.[9] They were damaged during the criminal investigation when government investigators opened them to look for foreign-manufactured components. Electrodyne argues that the restitution agreement contemplated that Electrodyne would fulfill part of its obligation by repairing those two converters, which it did at a cost of $2000. Electrodyne also provided NASA with a sample converter already in stock; it represents that the cost of that converter was "de minimis." Therefore, Electrodyne argues, the appropriate value of the particular four converters involved in this case is $14,595.65 (one converter) plus $2000 (repairs to two converters) plus zero (the fourth, sample converter), because this reflects the cost of restitution to Electrodyne.

The government again responds that Electrodyne obtained the underlying contract through fraud by promising American-made components for the contract price and thus can be charged with the full contract price. This ignores the distinction in our caselaw between fraud and theft; NASA's gains have to be counted against the loss.

We are persuaded by Electrodyne's argument about the repairs, but not by its argument about the sample converter. NASA had two converters that were damaged by Electrodyne's criminal conduct.[10] As part of its restitution, Electrodyne repaired the harm for $2000. It seems logical that the proper measure of harm is the cost of repairs when that was all that was required, and not the full cost of the converters. See United States v. Sablan, 92 F.3d 865, 869 (9th Cir. 1996) (charging the defendant with the cost of repairs when the result of her activity was damage, not destruction). Indirect support for this proposition is provided by Maurello, supra, in which we held that customers who were satisfied by the services of a defendant

_____

9. The government points out that the restitution agreement said that Electrodyne would "provide" converters, but it concedes that two of the converters were in NASA's possession at the time of the agreement.

10. We consider the damage caused by the investigation as included in the harm of Electrodyne's crime, because detection of the fraud required physical inspection of the components.

36

who fraudulently represented that he could practice law did not suffer "losses." Though the defendant's actions risked harm to them, if that harm did not materialize he could not be assessed with a "loss." Similarly, if the harm that materialized was a need for repairs and not a need to replace the entire machine, then the repairs should serve as the measure of the loss. The government does not dispute that the repairs were worth approximately $2000.

When it comes to the sample converter, though, Electrodyne is mistaking its costs (which may well be de minimis) with the harm inflicted on NASA. If NASA was deprived of a converter by Electrodyne's criminal conduct, then it was harmed by the value of one converter, which is apparently worth about $14,000 to a buyer. It was not clear error to value the converter at approximately $14,000, reflecting its market value, even if it was not worth as much to Electrodyne, the manufacturer.

Basing our calculation of loss on actual harm, it appears from the record that NASA was harmed by being deprived of two converters and by needing repairs to two others. Therefore, the total amount associated with the NASA converters would be approximately $30,000, the value of two converters plus $2000 in repairs.

3. Summary

We conclude that the Air Force contract and the full prices of two converters were improperly included in the loss calculation; hence vacatur and remand is necessary. The full price of a third converter was, however, properly included. Our rough calculation, derived from Electrodyne's plea agreement, is as follows:

| | |
|---|---:|
| Stipulated restitution to Air Force | $170,660.00 |
| Stipulated restitution to Naval Research Laboratory | 2,000.00 |
| Value of one converter | 14,595.65 |
| Approximate value of sample converter | 14,000.00 |
| Repair of two converters for NASA | 2,000.00 |
| Total Approximate Loss | $203,255.65 |

37

(The first three items have values that are not here in dispute.) This recalculation affects the Guideline range for Electrodyne's fine. On remand, the District Court may clarify its finding on the value of one converter to set the exact fine.

B. Ability to Pay

1. Background

Electrodyne argues that it is unable to pay a $500,000 fine.[11] As a result of its plea, Electrodyne was suspended from new government contracts and lost its export privileges, which constituted 80% of its business before the plea. At the time of the plea, Electrodyne had $1.9 million in back orders from the government and anticipated no profit on those contracts. The PSI stated that Electrodyne would cease to exist once it fulfilled its obligation under those remaining contracts. Electrodyne sold its assets to another company, AdComm; contracted out most of the remaining contract work; and fired all but five employees.

The District Court calculated Electrodyne's ability to pay as follows:

| $25,219.48 | First Union Account |
| $162,000 | Promissory note from AdComm |
| $31,486 | Security deposit from AdComm |
| $340,000 | Navy contract |

---

11. Electrodyne also contends that the government is estopped from arguing that Electrodyne can pay more than $140,000, because the plea agreement included an agreement on the appropriatefine to be presented to the District Court. This argument is without merit. Electrodyne had the benefit of its bargain: The government diligently argued the position set forth in the plea agreement to the District Court, which on its own initiative rejected the government's position. The plea agreement allowed the government to take any position on appeal. The appeal provision of the plea agreement contemplated exactly this sort of situation, in which a sentencing court rejects the government's position but the government chooses to support the court on appeal. See United States v. Griswold, 57 F.3d 291, 298–99 & n.10 (3d Cir. 1995).

38

$132,000          "Equitable adjustment" requested on
                  Defense Supply Center contract[12]

Total: $690,705.48.

Guideline section 5E1.2 requires that a fine be waived
when an individual defendant is unable to pay. By contrast,
section 8C3.3(b), the corresponding provision in the
corporate Sentencing Guidelines, does not require waiver or
reduction. At all events, as we recognized in Electrodyne I,
the fine must not be unrealistic. The sentencing court must
take account of the corporate defendant's financial
resources, putting the burden on the defendant to produce
relevant materials, before setting a fine that may consume
all of the defendant's assets. See Electrodyne I, 147 F.3d at
255.

Currently, Electrodyne states, it has only those physical
assets that are being used to fulfill the remaining contracts.
There is also a $162,000 balance on the promissory note
AdComm gave for Electrodyne's inventory. Moreover,
AdComm gave Electrodyne a security deposit of $31,486.
Finally, Electrodyne submitted a statement showing that it
had $1200 in its bank account as of May 31, 1998. It
represents that these various sources of income will allow
it to pay the $140,000 fine contemplated in its plea
agreement, but no more.

2. The Remaining Contracts

In Electrodyne I, we remanded for findings on
Electrodyne's ability to pay. By the time of resentencing, in
August 1998, two of Electrodyne's remaining five contracts
had been completed. The PSI had initially stated that the

_____

12. We admit to some confusion here. The contract amount, according to
the facts recited by the District Court, was $173,000. The amount used
by the District Court, $132,000, was apparently the upward adjustment
in the contract amount requested by Electrodyne but not yet granted at
the time of sentencing. We are unsure why the Court used the
adjustment number and not $173,000 or the combined total of
$305,000. Although the parties do not discuss this issue, it might be
useful for the Court to clarify its finding on remand, particularly if the
contract amount has been resolved.

contracts were break-even projects, and no further evidence on their profitability was presented. On one of the three outstanding contracts, the Defense Supply Center has declared Electrodyne in default. Electrodyne is appealing that declaration, and if it wins it will owe the government nothing, while if it loses it will owe $49,458. Thus, there are two remaining executory contracts, one with the Defense Supply Center and another with the Navy.

On the contract with the Defense Supply Center, Electrodyne submitted an affidavit stating that it was negotiating for a $132,000 increase in the contract price (originally $173,000). On the contract with the Navy, the contract amount was $340,000, and Electrodyne had delivered $88,000 worth of product and had received a $100,000 progress payment. The affidavit does not state whether these contracts are break-even; Electrodyne argues that it was entitled to rely on the PSI, which stated that the five contracts remaining at the time of the PSI were break-even. However, the District Court found that, because Electrodyne failed to specify the expenses incurred in connection with the manufacture of the components under the two remaining contracts, it would deem the full amount of the projected sales--$472,000--available to pay a fine. But see supra note 12 (noting that this might not be the full amount of the projected sales). Electrodyne argues that the Court ignored the obvious fact that manufacturing has costs, and that it made its findings in the face of the information in the PSI.

The government suggests that, consistent with our opinion in Electrodyne I, Electrodyne's failure to provide all the financial information requested by the Court upon remand insulates the Court's conclusions from attack. The government submits that the Court did not clearly err in deciding that the entire income stream from the remaining contracts would be available to pay a fine. It suggests that the materials for the contract might already have been manufactured and merely awaiting delivery, and so there might be no remaining manufacturing costs.

Electrodyne responds that it did not culpably fail to provide information. It points out that, after remand in Electrodyne I, the District Court ordered Electrodyne to

produce a number of documents relating to past expenses and profits, but did not order Electrodyne to set forth expenses projected for the remaining contracts. Moreover, Electrodyne produced a good deal of the requestedfinancial information, and it explained its inability to produce the missing information. It had never been subject to an audit according to generally accepted accounting principles. It submitted an affidavit from an accountant that a retroactive audit would not provide any reliable information because inventory could no longer be verified, that a full audit could cost up to $12,000 per year, and that because of the cost it was not standard for a business Electrodyne's size to undergo audits unless an investor or lender required them. It also submitted an affidavit from Sol Schneiderman, a consultant who was by mid-1998 the only person working full-time for Electrodyne, identifying the years for which Electrodyne did not have complete records and noting the current status of the remaining contracts. The District Court amended its order, relieving Electrodyne of the burden of producing documents that did not, according to Schneiderman, exist.

Electrodyne was able to provide tax returns from 1990 to 1997 and unaudited financial statements and balance sheets for 1990-1991, 1994-1997, and through May 31, 1998. The balance sheets showed sales costs between 65% (1995) and 82% (1994) of gross sales and operating expenses between 17% (1994) and 34% (1995 & 1996) of gross sales. In every year but 1990, therefore, Electrodyne's balance sheets show net operating pretax income of under 1% of gross sales. Electrodyne argues that the District Court ignored this record in concluding that Electrodyne would have no expenses for the remaining contracts. It asserts that if Electrodyne's net profit on the executory contracts averaged what it had been between 1990 and 1997, it would make $3304 in profit from the two contracts, a sum consistent with the prediction that the remaining contracts would be break-even propositions.

We have been unable to find guidance in the extant caselaw on determination of ability to pay. We find it difficult to believe that Electrodyne had no expenses when fulfilling its remaining contracts, but we are also

41

unconvinced that Electrodyne provided sufficient information. As Electrodyne changed from a going concern to a dying business, it is not obvious that past expenses are an appropriate guide; a one- or five-employee operation that is contracting out most of its work doubtless runs differently than a business that employs nearlyfifty employees. Therefore, Electrodyne's proposed measure of profit from the remaining contracts seems as unlikely to be accurate as the conclusion that the contract amounts represent pure profit.

However, Electrodyne may have been legitimately surprised by the District Court's conclusion that the two remaining contracts represented pure profit, given that the PSI stated otherwise and that the government never argued the issue. Because the only record evidence on the remaining contracts comes from the PSI, which labeled them break-even, we conclude that the District Court erred in deeming all contract payments available to pay afine. We emphasize that, were there other evidence in the record to the contrary, the District Court could have accepted it. On remand, we think that Electrodyne should be required to offer proof of its expenses in carrying out the remaining parts of the contracts. See Evans, 155 F.3d at 252 n.8 (sentencing court should inquire about the defendant's financial prospects). The burden of proving expenses is properly on Electrodyne, and the District Court may conclude that money not accounted for is available to pay a fine. See Electrodyne I, 147 F.3d at 254; United States v. Carr, 25 F.3d 1194, 1211-12 (3d Cir. 1994) (court may sua sponte recalculate a defendant's net worth in determining his ability to pay if the PSI recommends a fine; the burden is on the defendant to prove inability to pay a larger fine).13

_____

13. Electrodyne also argues that the District Court clearly erred in concluding that Electrodyne's May 1998 checking account balance of $25,219.48 was available in August. Schneiderman's June 26, 1998 affidavit stated that Electrodyne had $1200 in the bank, while a First Union bank statement dated June 30, 1998 listed $419.57 in the account. The government does not contest this point. On remand, the District Court should put together as accurate a picture of Electrodyne's financial position as possible, although we reiterate that it may properly place the burden on Electrodyne to account for funds.

42

3. Payment Schedule

Electrodyne further argues that it should not have to pay the total fine immediately. Guideline section 8C3.2(b) requires organizations to pay immediately unless the court finds that they are financially unable to do so or that immediate payment imposes an undue burden. Full payment should be required at the earliest possible date or in installments, within five years. See U.S.S.G. S 8C3.2(b). In Electrodyne I, we remanded for findings on the time within which Electrodyne's fine should be paid; while, on remand, the District Court ordered immediate payment, it did not specifically address the question whether all the assets it had identified were immediately available to pay a fine.

The District Court counted $162,000 on AdComm's promissory note as available funds. However, that money is paid monthly in $1566.35 increments, scheduled to end in February 2002. Similarly, the Court considered the amounts due on the executory contracts immediately available. However, the government had, at the time of briefing, made only a $100,000 progress payment on one of the two contracts. An unaudited balance sheet from May 31, 1998, showed that Electrodyne's liabilities exceeded its assets by $32,156 on that date. The government does not address the issue of a payment schedule. In view of the foregoing, we are constrained to conclude that the District Court abused its discretion in finding the total amounts due from AdComm and from the remaining government contracts immediately available, because it is incontrovertible that Electrodyne does not yet have that money. Again, the judgment must be set aside, and on remand the District Court should determine a proper schedule of payments.

IV. Reassignment on Remand

An impartial judge is a basic due process requirement. We have on occasion exercised our supervisory power to reassign judges on remand in order to preserve the reality and appearance of impartiality. See Alexander v. Primerica Holdings, Inc., 10 F.3d 155 (3d Cir. 1993); Haines v. Liggett Group, Inc., 975 F.2d 81, 98 (3d Cir. 1992).

43

The defendants argue that the District Court appears to have made up its mind about important elements of the case without having any information to back up its suppositions. It is clear that the District Court repeatedly, and contrary to the record, stated that the defendants' conduct had endangered the safety of American troops, arguably relying on its own deeply held patriotic views in derogation of the clear record and skewing the sentencing decision. Therefore, the defendants submit, the judge gave an appearance of partiality and prejudgment sufficient to justify reassignment to a different judge on remand. The government responds that there is no evidence that the District Court would defy our mandate. It did indeed cut Electrodyne's fine in half, from $1 million to $500,000, after the first remand, and it adhered to our mandate while exercising its discretion to resolve a number of contested issues (though not all) against the defendants.

The matters left for resolution in the wake of this opinion are few and relatively circumscribed. We conclude that the drastic remedy of reassignment is not necessary here. Moreover, the case remains a complex one that would weigh heavily on a sentencing judge unfamiliar with the facts. We have every confidence that the able and industrious District Judge will, as he has before, follow our mandate.

V. Conclusion

For the foregoing reasons, the judgment of the District Court will be reversed, and the cases will be remanded for further proceedings consistent with this opinion.14

_____

14. In one respect, the appeal is dismissed. See supra note 6 and accompanying text.

44

RENDELL, Circuit Judge, concurring and dissenting:

I concur in part and dissent in part from Chief Judge Becker's comprehensive opinion, because I would affirm the District Court's upward departure decision.

This is a difficult case, factually and legally. It is made perhaps more difficult by several "disconnects" along the way. Principal among these are: first, the government's willingness to accept guilty pleas to violations of statutes punishing false entry documents and false markings on goods, when the admitted conduct consisted of a well-orchestrated scheme to produce, in foreign countries, goods for military use that were, by law and by contract, to be produced in the United States, in violation of several federal statutes; and second, the lack of "fit" of the crime charged and the conduct conceded with the specified sentencing guideline, which applies primarily to crimes involving revenue collection and trade regulation.15

I fault these mismatches for the District Court's need to resort to an upward departure. Unlike the majority, I read the District Court's upward departure as having been based not so much on the threat to the military that the majority references, but rather, on entirely proper grounds. These are: (1) that the offense was outside the heartland duty evasion case because the falsification and absence of markings was done not merely to evade duties, but to conceal an extensive criminal scheme that violated several other laws; and (2) to account for the uncharged fraudulent conduct (i.e., dismissed counts) clearly conceded by defendant at the guilty plea colloquy, both permissible grounds for upward departure under our holding in United States v. Baird, 109 F.3d 856 (3d Cir. 1997). 16

_____

15. The majority characterizes the applicable guideline as a "smuggling" guideline and it is in the sense that it applies to improper introduction of goods into the country, but it is addressed primarily at duty evasion. The guideline itself notes that importing of contraband or restricted goods is covered by other guideline provisions.

16. It is ironic that while a sentencing court could not start with an applicable guideline offense level unless the defendant actually stipulated to the conduct, the sentencing court can clearly arrive at that level in the end by departing upward, based upon relevant conduct admitted in connection with the plea but uncharged (or dismissed). In United States v. Baird, we held that result to be quite permissible.

This sentencing would have proceeded differently had there been a more suitable starting point than a duty evasion guideline. The absence of a more specific guideline as to the type of crime committed -- which is, by its nature, not your run-of-the-mill duty evasion or, even, fraud, offense -- was, I believe, at the heart of the dilemma facing the sentencing judge. The District Court did the best it could with the hand it was dealt by the Sentencing Commission. The majority concludes that the sentencing judge abused his discretion. I submit that he reached an understandable -- and, I believe, appropriate-- result.

I agree with the thorough analysis of my colleague with respect to all of the issues, save this one. I would affirm the upward departure determination of the District Court and therefore respectfully dissent from that portion of the opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit